827 A.2d 124

**Walter PINKNEY**

v.

**STATE of Maryland.**

**No. 2529, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

June 20, 2003.

312

Sherrie B. Glasser, Asst. Public Defender, Amy L. Kneep (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Zoe Gillen White, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., Patricia Jessamy, State's Atty. for Baltimore City, on brief), Baltimore, for appellee.

**314**

Argued before MURPHY, C.J., DAVIS, HOLLANDER, SALMON, EYLER, JAMES R., SONNER, KENNEY, EYLER, DEBORAH S., ADKINS, KRAUSER, BARBERA, GREENE, THEODORE G. BLOOM (Ret., specially assigned), JJ.

JAMES R. EYLER, J.,

Appellant, Walter Pinkney, challenges his first degree murder and child abuse convictions for the brutal killing of his step-grandson, six-month-old Ta'mar Hamilton. Following a four-day trial on the merits, the jury returned verdicts of guilty on the first degree murder and felony child abuse counts, and appellant was subsequently sentenced to a term of life imprisonment for the first degree murder conviction and 30 years imprisonment for the child abuse conviction, to be served consecutively.

On appeal, appellant alleges three errors. First, he argues that the evidence was legally insufficient to sustain a conviction of first degree murder, *i.e.*, that the court erred in failing to grant his motion for judgment of acquittal. Next, he contends that the trial court erred in admitting the prior statements of Renita Pinkney, Ta'mar's paternal grandmother, who was appellant's girlfriend at the time and who is now appellant's wife.[1] Finally, appellant claims that the court erred in precluding the defense from pursuing relevant testimony about the actions and behavior of Larry Hamilton, Jr., Ta'mar's father. Perceiving no error in the trial court's evidentiary rulings and finding that there was sufficient evidence to sustain the first degree murder conviction, we affirm appellant's convictions.

## Factual Background

On the evening of November 27, 1999, officers of the Baltimore City Police Department went to The Johns Hopkins

---

1. At the time Ta'mar died, Renita Pinkney's last name was Williams, as she had not yet married appellant. Ms. Williams and appellant were married on December 9, 1999, eight days after Ta'mar's death. She will be referred to as Ms. Pinkney for purposes of this appeal.

Hospital in response to a call of suspected child abuse of six-month-old Ta'mar Hamilton. David Peckoo, one of the investigating officers, interviewed Renita Pinkney and appellant, who, he had been told, were responsible for the care and custody of Ta'mar, before Ta'mar was rushed to the hospital earlier that day.

Ta'mar died from his injuries on December 1, 1999. On December 3, 1999, after an autopsy had been performed on Ta'mar, police investigators again interviewed Ms. Pinkney and appellant. On December 14, 1999, appellant was arrested and charged with first degree murder and child abuse.

The evidence at trial portrayed the following chronology of events surrounding Ta'mar's death. On Thursday, November 25, 1999, Thanksgiving, arrangements were made for Larry Hamilton, Sr., Ta'mar's paternal grandfather, and appellant to pick up Ta'mar and his brother, Davon Hamilton, then 15 months old, from their mother, Shawntel Rice, and take them to the home of Ms. Pinkney and appellant to stay for the remainder of the Thanksgiving weekend. The men arrived at the home of Ms. Rice and placed both children in their car seats. During the car ride to Ms. Pinkney's and appellant's house, Ta'mar was cranky and cried for most of the trip.

Upon their arrival, Larry Hamilton, Sr. instructed his son, Larry Hamilton, Jr., the boys' father, to remove the children from the car and bring them into the house. There is conflicting testimony about Hamilton, Jr.'s actions following his father's demand, suggesting varying levels of harshness with which Hamilton, Jr. physically brought the children into the home. According to Ms. Pinkney, Hamilton, Jr. removed the children from the car and, while they still were strapped into their car seats, threw them up several steps into the vestibule of the house. Hamilton, Jr. testified that he retrieved one child at a time and handed the first car seat off to someone before retrieving the second. Finally, another witness described Hamilton, Jr.'s dropping the car seats into the vestibule, after carrying them up the stairs, because his pants

were falling down. There was undisputed testimony that the car seats were padded, and that they landed upright.

Once the children were inside the house, Hamilton, Jr. and other visitors remained for one to two hours. They then departed, leaving Ms. Pinkney and appellant alone with Ta'mar and Davon. Ta'mar continued to cry and was generally cranky. Before putting the children to bed, appellant gave Ta'mar a bath. Ta'mar slept only a few hours on Thursday night. He awoke at 3 a.m. on Friday morning and required feeding and changing. He did not fall back to sleep until 6 a.m.

On Friday afternoon, after observing Ta'mar's continued crankiness, Ms. Pinkney took Ta'mar to a clinic. Davon remained in the care and custody of appellant. Ms. Pinkney waited several hours only to be told that the clinic would not treat Ta'mar because he was not covered by insurance. She returned home with Ta'mar late Friday afternoon. When she tried to feed him, Ta'mar would not eat or drink.

Ms. Pinkney and appellant fell asleep on the couch for a few hours with both children. They then took the children upstairs to bed, keeping Davon in the room with them, and putting Ta'mar to sleep in another room. During that night, Ta'mar cried constantly, and Ms. Pinkney and appellant took turns patting his back, walking him around the room, and trying to calm him. Ta'mar briefly slept between the hours of 3 and 6 a.m. Thereafter, he slept only for short periods of time.

At approximately 10 a.m., Ms. Pinkney went to the store for diapers, leaving the children in appellant's care. She checked and saw that Ta'mar was asleep before she left. According to appellant, while Ms. Pinkney was away, Ta'mar awoke and began crying, so he went into the room where Ta'mar was and picked him up to try to calm him. He tried to feed Ta'mar from a bottle, but Ta'mar only drank a small amount, approximately 3 and a half ounces. Appellant testified that he was changing Ta'mar's diaper following a suspected bowel movement when Ta'mar gasped for breath and stopped breathing.

Immediately, he called 911 and began giving Ta'mar CPR. He was still trying to resuscitate Ta'mar when Ms. Pinkney returned home. An ambulance then arrived and transported Ta'mar to The Johns Hopkins Hospital ("Hopkins").

Ta'mar was admitted to the Pediatric Emergency Department. Dr. Allen Walker, Director of that Department, was contacted to evaluate Ta'mar. Dr. Walker diagnosed Ta'mar as having sustained a severe brain injury. Dr. Walker interviewed Ms. Pinkney and appellant, trying to ascertain what had happened before Ta'mar was brought into the hospital. During the interview, appellant described Ta'mar's constant crankiness, refusal to eat, how Ta'mar had stopped breathing while he was changing his diaper, how he had immediately contacted 911, and his attempts at CPR. Thereafter, Dr. Walker spoke with the police.

Officer Brian Rice arrived at the hospital and interviewed Ms. Pinkney and appellant. During the interview, appellant again explained that Ta'mar had been cranky and crying all weekend and that he had stopped breathing on Saturday morning.

Devoark Maddox, a clinical social worker at Hopkins, testified regarding her completion of a child maltreatment form, based on her interview with appellant and Ms. Pinkney at the hospital. During the interview, appellant described the events, including his telephone call to 911 and his attempt to resuscitate Ta'mar. Ms. Maddox described appellant as calm and forthcoming during their interview.

Detective David Peckoo also interviewed appellant and Ms. Pinkney at the hospital that day. The interview revealed much of the same information discussed above.

The autopsy revealed that the cause of Ta'mar's death was blunt force trauma as a result of four injuries to his head. After receiving the autopsy results, Detective Peckoo asked Ms. Pinkney and appellant to come to the police station for a second interview. They did so voluntarily on December 3, 1999, and he took recorded statements from them both. During this second interview, appellant indicated that he might

have hit Ta'mar's head on the bed rail while trying to get him to respond after he stopped breathing. He also admitted that he had shaken Ta'mar a few times.

As part of the investigation, Detective Peckoo removed the bed rail from Ms. Pinkney's home and tested it for blood, semen, and hair. The test results were negative for those substances and did not reveal any evidence of human contact. On December 14, 1999, appellant was arrested and charged with first degree murder and child abuse of Ta'mar Hamilton.

Following selection of a jury and an unsuccessful pre-trial suppression hearing,[2] a trial on the merits began on September 19, 2000. The State presented the testimony of eight witnesses in the following order: Officer Brian Rice, Devoark Maddox, Dr. Allen Walker, Shawntel Rice, Renita Pinkney, Detective David Peckoo, Larry Hamilton, Jr., and Dr. Joseph Pestaner. The defense offered the testimony of Larry Hamilton, Sr., Sheena Watkins, and appellant. These witnesses testified to the following additional information.

Dr. Walker testified in great detail about the extent and cause of Ta'mar's fatal injuries, explaining that (1) severe brain injury was his initial diagnosis, (2) Ta'mar's chance for survival was almost non-existent, (3) the injuries were almost everywhere, *i.e.*, the brain and skull had been virtually destroyed, (4) violent force, similar to the force when someone is thrown through the windshield in a car crash or falls from a third floor window, was required to inflict the type of injuries that Ta'mar had sustained to his head, and (5) such violent blows would have rendered Ta'mar immediately unconscious so as to make him incapable of crying or drinking formula. Dr. Walker also described the rest of Ta'mar's stay at Hopkins, explaining that for a couple of days he was maintained on

---

2. Prior to the trial, appellant argued that his statements to police made on December 3, 1999, should be suppressed based on physical coercion by the interviewing officers, making the statements involuntary. After hearing testimony and finding appellant's version of events to be incredible, the court denied the motion.

a number of medications and a ventilator because he could not breathe for himself, and that, during that time, his brain died.

During cross-examination, Dr. Walker testified, with the assistance of hospital records, that Ta'mar had been delivered prematurely, requiring assistance with breathing, and that Ta'mar's mother had a sexually transmitted disease when Ta'mar was delivered. He also testified that Ta'mar was brought into the Hopkins Pediatric Emergency Department when he was three months old for pneumonia and was treated with IV antibiotics and sent home. Finally, Dr. Walker testified that the autopsy revealed that there was a healing rib fracture at the time of his death from an injury suffered prior to November 27, 1999.

Shawntel Rice, Ta'mar's mother, testified for the State about the events of November 25, when her sons were picked up by appellant and Larry Hamilton, Sr., and about how she learned that Ta'mar had been admitted to Hopkins. She also testified about Ta'mar's demeanor generally and his behavior prior to being picked up on the 25th.

In addition to testifying about the specific events that occurred between November 25 and 27, 1999, Ms. Pinkney testified generally about the parenting skills of her son and Shawntel Rice. She explained that her son and Ms. Rice, as well as the two boys, had lived in her home for a period of time just after Ta'mar was born. She also explained that, after they left her home, she and appellant continued to watch the two children on a daily basis for a while, but that arrangement ended a few weeks prior to the Thanksgiving weekend visit. According to Ms. Pinkney, Ms. Rice asked her if she and appellant would watch the children for the weekend. Ms. Pinkney reluctantly agreed after Ms. Rice promised to provide a place for Davon to sleep.

Ms. Pinkney further testified that the reason she asked her son and Ms. Rice to leave her home was because they used drugs and did not take good care of their children, neglecting to feed them or play with them. She further testified that they cursed at Ta'mar and Davon and that she witnessed them

hit both boys on several occasions. The prosecutor challenged Ms. Pinkney's assertions by pointing out that she had never mentioned any past abuse to anyone prior to her testimony in court.

Finally, Dr. Joseph Pestaner, an expert in forensic and pediatric pathology, was called by the State to testify regarding the autopsy he performed on Ta'mar. His testimony was substantially similar to that of Dr. Walker but was more detailed. He was able to discount other incidents, such as older injuries or being tossed in his car seat, as possible causes of Ta'mar's fatal injuries, reinforcing what Dr. Walker said about the amount of force that would have been required to cause such serious damage to Ta'mar's brain and skull. Dr. Pestaner also echoed Dr. Walker's opinion that Ta'mar would have been rendered unconscious almost immediately after being struck, such that crying and drinking from a bottle would not have been possible.

Larry Hamilton, Sr. and Sheena Watkins were called for the defense and testified generally regarding the events on November 25, 1999, when Ta'mar was brought to the home of Ms. Pinkney and appellant. Larry Hamilton, Sr. also testified that he observed his son, Larry Hamilton, Jr., strike Ta'mar in the head on several occasions between September 11, 1999, and the week prior to Thanksgiving of 1999.

Appellant testified in his own defense, describing the events of November 25–27, emphasizing Ta'mar's continuous crying, as well as his efforts to calm him by walking him, patting his back, attempting to feed him a bottle, and changing his diaper. He also described how Ta'mar stopped breathing and how he immediately called 911 for assistance and tried to resuscitate him by performing CPR.

During cross-examination, the prosecutor asked appellant about his admission during his December 3 statement to Detective Peckoo that he may have accidentally hit Ta'mar's head when he was shaking him to revive him. Acknowledging that admission, appellant went on to say that after thinking about it for some time after talking to Detective Peckoo, he

knew that Ta'mar did not hit his head. In response to the prosecutor's questions about whether, by Saturday morning, he was tired and frustrated by Ta'mar's constant crying and crankiness, appellant admitted to being tired from the sleepless nights, but denied that he was frustrated by his failed attempts to quiet the baby. Finally, the prosecutor reviewed with appellant another part of his statement to Detective Peckoo, in which appellant described Ta'mar's cries as sounding like a child who had been hit, and explained that when he touched Ta'mar's head, he cried out like someone was beating him. Appellant admitted that he told Detective Peckoo that his first response was to think to himself, "What did I do?"

On the same day that closing arguments were delivered, the jury returned a verdict of guilty on both the first degree murder and child abuse counts. On December 4, 2000, the court sentenced appellant to life imprisonment for the first degree murder conviction, and 30 years incarceration for the child abuse conviction, to be served consecutively.

Appellant filed an appeal to this Court on December 21, 2000. Counsel for both parties argued before a three-judge panel of this Court on February 11, 2002.[3] Following that argument, by order dated March 10, 2003, this Court, on its own motion, ordered that an *en banc* hearing be held on April 29, 2003, to consider whether the theory of the case that the State argued to the jury precluded the jury from convicting appellant of first degree murder.[4] Specifically, this Court asked the parties to address whether the State argued that appellant's intent was to stop Ta'mar from crying as distinguished from arguing that appellant's intent was to kill Ta'mar, with the desire to stop the crying as a motive for the intent, and if so, the legal effect of the State's argument. After reviewing the record and considering the arguments, we are satisfied that the State argued that appellant intended to

---

3. The sole issues argued before the panel were the three issues set forth at the beginning of this opinion.

4. The parties were given an opportunity to submit memoranda addressing the issue for the Court to review prior to the *en banc* argument.

kill Ta'mar. Consequently, we need not address the legal issue raised by the Court and will address only the issues raised by appellant.

Additional facts will be set forth as relevant to our resolution of the issues.

### Discussion

We begin with a discussion of appellant's evidentiary challenges.

#### Alleged Errors in the Admission of Evidence

■ Appellant alleges two errors in the trial court's evidentiary determinations. Appellant's first challenge involves a recorded statement that Renita Pinkney gave to police on December 3, 1999, a week after the murder. In that statement, Ms. Pinkney denied having seen Ta'mar sustain any abuse or injuries during the Thanksgiving weekend visit prior to his death. She testified to the same effect on direct examination by the State. During cross-examination, however, she stated that on November 25, 1999, her son, Larry Hamilton, Jr., threw Ta'mar's car seat up a flight of stairs into the vestibule while Ta'mar was strapped inside. On re-direct, the State challenged the inconsistency by asking Ms. Pinkney questions about her prior statement and later admitted the statement through the testimony of Detective Peckoo.

Appellant argues that the trial court erred in admitting the December 3, 1999, statement because it failed to meet the foundational requirements laid out in Maryland Rule 5–613(a), which requires that the speaker be shown the statement and provided with an opportunity to explain it before its admission. In response, the State first argues that this claim was waived because, when defense counsel stated his basis for the objection to its admission, he mentioned only that Ms. Pinkney had already testified, and thus the jurors should base their decision on her testimony only. On the merits, the State argues that, if preserved, the court did not err because the statement was properly admitted pursuant to Maryland Rule 5–802.1, which governs the admission of prior statements by witnesses.

While we disagree with the State's preservation argument,[5] we agree that the statement was properly admitted under Rule 5–802.1, which governs the admission of extrinsic evidence of a prior inconsistent statement when it is offered as substantive evidence, rather than for impeachment purposes. Specifically, Rule 5–802.1(a)(3) provides that a prior statement is not hearsay if made by a witness who testifies at trial and who is subject to cross examination concerning the statement if that statement is "recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement[.]" The rule does not contain the same foundational requirements as Rule 5–613; and therefore Ms. Pinkney's statement meets all of the requirements of Rule 5–802.1 and was properly admitted.

■ Appellant's second evidentiary challenge claims that the trial court abused its discretion in excluding relevant testimony regarding Larry Hamilton, Jr.'s treatment of Ta'mar and general behavioral characteristics. Specifically, appellant argues that defense counsel should have been permitted to pursue a line of questioning regarding Hamilton, Jr.'s character, drug use, and abusive treatment of his children, to raise the possibility that Ta'mar's fatal injuries were not caused by appellant but, rather, were the result of Hamilton, Jr.'s mistreatment of Ta'mar. Appellant acknowledges, however, that both Ms. Pinkney and Larry Hamilton, Sr. were permitted to testify about their observation of Hamilton, Jr.'s neglect and physical abuse of Ta'mar and his brother, Davon.

The State contends that the trial court properly exercised its discretion in precluding certain testimony regarding Larry Hamilton, Jr., arguing that (1) evidence regarding Hamilton, Jr.'s involvement with drugs had no relevance to the issue of whether appellant killed Ta'mar, and (2) Hamilton, Jr.'s al-

---

5. We think that the State's reading of defense counsel's basis for objecting is too narrow. Although defense counsel initially focused on the fact that Ms. Pinkney's testimony should speak for itself, he went on to argue that the statement was inadmissible because Ms. Pinkney was not given an opportunity to read it and determine whether there was an inconsistency.

leged threats to Ms. Pinkney had no tendency to make it more or less likely that appellant actually killed Ta'mar. Maryland Rule 5–401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." We have stated that a ruling on the relevancy of the evidence is "quintessentially" within the wide discretion of the trial court. *See Best v. State,* 79 Md.App. 241, 259, 556 A.2d 701, *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989). In addition, the Court of Appeals has stated that a trial court's determination as to the relevancy of evidence will not be reversed absent a clear showing of abuse of discretion. *See White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991); *Hunt v. State,* 321 Md. 387, 425, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991).

The trial court did not abuse its discretion in determining that evidence regarding Hamilton, Jr.'s drug use and alleged threats toward Ms. Pinkney was irrelevant to the issue of appellant's guilt. Thus, the evidence was properly excluded pursuant to Maryland Rule 5–402, which provides that "[e]vidence that is not relevant is not admissible."

### Sufficiency of the Evidence

Given our rejection of both of appellant's evidentiary challenges, we turn to appellant's main argument—that the evidence was insufficient to sustain a conviction of first degree murder. Specifically, appellant argues that the evidence failed to establish (1) that appellant was the individual who inflicted the fatal injuries upon Ta'mar Hamilton, or (2) that, if appellant did in fact inflict those injuries, he did so with malice or with the premeditation or deliberation necessary for a finding of first degree murder. In support of his second argument, appellant first turns to cases discussing Maryland's statutory elements for first degree murder, arguing that the evidence does not satisfy the statute's strict requirements. In addition, appellant reviews other Maryland cases involving abuse inflict-

ed upon a child resulting in death, suggesting that when the fatal act is the result of an emotionally charged situation involving a baby, the accused is, at most, found guilty of second degree murder. Finally, appellant urges us to consider the fact that other jurisdictions have been hesitant to convict a defendant of first degree murder for the death of a child.

In response to appellant's sufficiency of the evidence argument, the State first argues that appellant's challenge is not preserved for appellate review. Pointing to Maryland Rule 4–324, which governs motions for judgment of acquittal, the State argues that appellant is bound by the reasons stated when he renewed the motion at the end of appellant's case, when defense counsel stated: "I renew my Motion for Judgment of Acquittal because there has been no evidence introduced beyond a reasonable doubt to prove Mr. Pinkney guilty." *See* Md. Rule 4–324(a) ("A defendant may move for judgment of acquittal . . . in a jury trial, at the close of all the evidence. The defendant shall state with particularity all reasons why the motion should be granted."). Consequently, the State contends that appellant's claims are not preserved for review because they were not articulated as the basis for his motion for judgment of acquittal at the close of all of the evidence. On the merits, the State argues that, when applying the deferential standard of review for sufficiency challenges, it is clear that there was ample evidence from which the jury could properly conclude that appellant was guilty of first degree murder.

 While there is some merit to the State's preservation argument, because we conclude that the evidence was legally sufficient and appellant's conviction will not be disturbed, we shall resolve the uncertainty as to preservation in favor of appellant and reach the merits. Accordingly, we begin by reviewing the standard of review for sufficiency of the evidence challenges. Most recently, the Court of Appeals, in *State v. Smith*, 374 Md. 527, 823 A.2d 664, 2003 Md. LEXIS

251 (Md. May 9, 2003),[6] discussed the standard of review in great depth, stating:

The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 313, 99 S.Ct. 2781, 2785, 61 L.Ed.2d 560, 569 (1979); *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821, 827 (2002); *White v. State,* 363 Md. 150, 162, 767 A.2d 855, 861–62 (2001); *State v. Albrecht,* 336 Md. 475, 478–79, 649 A.2d 336, 337–38 (1994). "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323, 331 (1998). *See McDonald v. State,* 347 Md. 452, 474, 701 A.2d 675, 685–86 (1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998) (quoting *Albrecht,* 336 Md. at 478, 649 A.2d at 337); *Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037, 1040–41 (1991); *Wright v. State,* 312 Md. 648, 541 A.2d 988 (1988). "We give 'due regard to the [fact finder's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.'" *Moye,* 369 Md. at 12, 796 A.2d at 827 (quoting *McDonald v. State,* 347 Md. 452, 474, 701 A.2d 675, 685 (1997) (quoting *Albrecht,* 336 Md. at 478, 649 A.2d at 337)). *See* the following recent cases quoting *Albrecht: Anderson v. State,* 372 Md. 285, 291–92, 812 A.2d 1016, 1020 (2002); *Deese v. State,* 367 Md. 293, 305, 786 A.2d 751, 758 (2001); *Galloway v. State,* 365 Md. 599, 649, 781 A.2d 851, 880 (2001); *White,* 363 Md. at 162, 767 A.2d at 861–62. We do not re-weigh the evidence, but "we do determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *White,* 363

---

6. The following quotes are from the plurality opinion. There were two concurring opinions and a dissenting opinion. Six judges concurred in the result and, effectively, in the standard of review.

Md. at 162, 767 A.2d at 862. A valid conviction may be based solely on circumstantial evidence. *Wilson v. State,* 319 Md. 530, 537, 573 A.2d 831, 834 (1990). The same standard applies to all criminal cases, including those resting upon circumstantial evidence, since, generally, proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts. *See Eiland v. State,* 92 Md.App. 56, 607 A.2d 42 (1992), *rev'd on other grounds,* 330 Md. 261, 623 A.2d 648 (1993).

*Id.* at 533–34, 823 A.2d at 667–68.

Noting some confusion regarding the amount of deference that an appellate court should give to the fact finders' ability to draw inferences from the evidence, the Court went on to explain:

The following cases further emphasize a trial judge's or a jury's ability to choose among differing inferences that might possibly be made from a factual situation and the deference we must give in that regard to the inferences a fact-finder may draw. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 (noting the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts); *Jones v. State,* 343 Md. 448, 460, 682 A.2d 248, 254 (1996) (Involving a probable cause issue the Court stated "it is the trier of fact that must draw the inferences.... Consequently, absent clear error in its fact-finding, an appellate court is required, in deference to the trial court, to accept those findings of fact."); *In re Timothy F.,* 343 Md. 371, 379–80, 681 A.2d 501, 504–05 (1996) (in criminal cases the appropriate inquiry is not whether the reviewing court believes that the evidence established guilt beyond a reasonable doubt, but, rather, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt); *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430, 434–35 (1992) (stating that "The trial court's findings as to

disputed facts are accepted by this Court unless found to be clearly erroneous"); see also *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1241 (1990).

In *State v. Raines*, 326 Md. 582, 590–93, 606 A.2d 265, 269–70 (1992), the Court stated:

"This analysis indicates that the Court of Special Appeals credited the Raines's version of the events, one that necessarily mitigated his culpability. Of course, the credibility of the witnesses was a matter for the trial court, as fact finder, not the appellate court, to resolve. Furthermore, the determination of an accused's intention is, in the first instance, for the trial judge, when sitting without a jury, and this determination will not be disturbed on appeal unless clearly erroneous. As noted, the trial court discounted Raines's version of the events. Instead, the court drew an inference based on other evidence offered at trial that the killing was intentional, deliberate and premeditated. This, the trial court, as fact finder, has the exclusive right to do. The Court of Special Appeals erred in conducting its own independent credibility analysis and in rejecting the trial court's finding of facts.

". . . This Court has noted that the trier of fact may infer the intent to kill from the surrounding circumstances:

"[S]ince intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence."

. . .

". . . Raines's actions in directing the gun at the window, and therefore at the driver's head on the other side of the window, permitted an inference that Raines shot the gun with the intent to kill. Relying upon that inference, the trial judge could rationally find, beyond a reasonable doubt, that the killing was wilful, deliberate and premeditated so as to render Raines guilty of first degree murder.

"Although a different trier of fact may have viewed the evidence as establishing second degree murder instead of

first degree murder, the trial court's decision was not clearly erroneous. The Court of Special Appeals erred in substituting its judgment for that of the trial court on the evidence." [Citations omitted.]

While in *Raines*, and in some of the other cases, the exact issues relate to the proof of intent in respect to the type of homicide, we, and the Court of Special Appeals, have held that even in murder cases, intent may be established by the use of rational inferences from the underlying evidentiary facts.

*Id.* at 534–35, 823 A.2d at 668–69.

■■■ The Court's articulation and explanation of the standard emphasizes three important principles: (1) we must give great deference to the trier of facts' opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence, (2) circumstantial evidence alone can provide a sufficient basis upon which a trier of fact can rest its determination of guilt, even for first degree murder, and (3) we do not re-weigh the evidence or substitute our own judgment, but only determine whether the verdict was supported by sufficient evidence to convince the trier of fact of the defendant's guilt beyond a reasonable doubt. These principles were summarized by the *Smith* Court when it stated:

The primary appellate function in respect to evidentiary inferences is to determine whether the trial court made reasonable, *i.e.*, rational, inferences from extant facts. Generally, if there are evidentiary facts sufficiently supporting the inference made by the trial court, the appellate court defers to the fact-finder instead of examining the record for additional facts upon which a conflicting inference could have been made, and then conducting its own weighing of the conflicting inferences to resolve independently any conflicts it perceives to exist. The resolving of the conflicting evidentiary inferences is for the fact-finder.

*Id.* at 547–48, 823 A.2d at 676.

Appellant's sufficiency argument presents two separate issues; first, whether there was sufficient evidence to prove that

appellant was the individual who caused the fatal injuries suffered by Ta'mar; and second, whether there was sufficient evidence to demonstrate that appellant killed Ta'mar wilfully, deliberately, and with premeditation. Appellant's first claim is primarily premised on his theory that evidence that was both admitted and excluded tended to show that Ta'mar's father, Larry Hamilton, Jr., may have been the responsible party. We previously held that the court did not abuse its discretion by excluding certain evidence regarding Larry Hamilton, Jr. In addition, we do not think that any of the evidence that was admitted precluded the jury from finding that appellant was the individual who inflicted the fatal injuries to Ta'mar's head.

In *Deese v. State*, 367 Md. 293, 786 A.2d 751 (2001), a case with similar facts to ours, the Court of Appeals affirmed the defendant's second degree murder conviction[7] based on its application of the rule that "[i]t is well settled that a conviction may be sustained on the basis of circumstantial evidence." *Id.* at 308, 786 A.2d 751 (citing *Hebron v. State*, 331 Md. 219, 228, 627 A.2d 1029 (1993)). Applying the above rule to the facts of the case, the Court explained that

the evidence most favorable to the State is that (1) Kyle was alive on the morning of February 8, (2) Kyle was under Deese's exclusive supervision for a period of time on that day, (3) Kyle was found dead a few hours after that period, (4) death was due to blunt force injuries to the head [caused by force of a magnitude at work in car crashes and falls from significant heights] and possibly due to shaking, and (5) no one had contact with Kyle after the period described in (2) and before the event described in (3). From these circumstances, a rational jury could have inferred, beyond a reasonable doubt, that Deese inflicted the fatal injuries.

*Id.* (reasoning that other cases have affirmed convictions based on circumstantial evidence when a defendant, during the commission of the crime, exercised exclusive control or custo-

7. First degree murder was never discussed in the opinion.

dy over the premises where the crime occurred). The similarity between the facts in *Deese* and those in the present case support our application of the *Deese* Court's reasoning to hold that there was sufficient evidence from which the jury could have concluded beyond a reasonable doubt that appellant was the individual who inflicted the fatal blows to Ta'mar's head.

Appellant was convicted under section 407 of Article 27 of the Maryland Code, which provides that "[a]ll murder which shall be perpetrated . . . by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree." Md.Code, art. 27 § 407 (1957, 1996 Repl.Vol., 2000 Supp.).[8] As appellant properly recognized, the State has the burden of proving each element of the crime beyond a reasonable doubt. *Bane v. State,* 327 Md. 305, 311–12, 609 A.2d 313 (1992) (citing *State v. Evans,* 278 Md. 197, 206–07, 362 A.2d 629 (1976)). We are reminded that, on appellate review, we are not asked to re-weigh the evidence or substitute our judgment for that of the jury, but instead, we must simply determine "whether, after viewing the evidence in the light most favorable to the prosecution, [the jury] could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821 (2002); *White v. State,* 363 Md. 150, 162, 767 A.2d 855 (2001); *State v. Albrecht,* 336 Md. 475, 478–79, 649 A.2d 336 (1994).

Having determined that there was sufficient evidence upon which the jury could have found that appellant caused Ta'mar's death, we turn our focus to the additional three elements of first degree murder—wilfulness, deliberation, and premeditation. The Maryland Criminal Pattern Jury Instructions 4:17 (2001), which were used by the trial judge in this case, define those three elements by stating:

> Wilful means that the defendant actually intended to kill the victim. Deliberate means that the defendant was conscious of the intent to kill. Premeditated means that the

---

8. Maryland's first degree murder statute now appears in section 2–201(a)(1) of the Criminal Law article of the Maryland Code.

defendant thought about the killing and that there was enough time before the killing, though it may have only been brief, for the defendant to consider the decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.

The Court of Appeals has reinforced the application of those definitions by stating that first degree murder requires "that the defendant possess the intent to kill (willful), that the defendant have conscious knowledge of the intent to kill (deliberate), and that there be time enough for the defendant to deliberate, *i.e.,* time enough to have thought about that intent (premeditate)." *Willey v. State,* 328 Md. 126, 133, 613 A.2d 956 (1992) (holding that the jury instructions adequately distinguish between first and second degree murder).

Despite these seemingly clear definitions, we are mindful that it is often difficult to understand these concepts in the abstract,[9] and even more difficult to determine whether each is satisfied when faced with a specific set of facts. Fortunately, a body of case law has developed to guide our interpretation and application of these definitions.

First, examining the wilfulness requirement, we have stated that "[f]or a killing to be 'wilful' there must be a specific purpose and intent to kill[.]" *Snyder v. State,* 104 Md.App. 533, 549, 657 A.2d 342 (1995) (quoting *Tichnell v. State,* 287 Md. 695, 717–18, 415 A.2d 830 (1980)); *see also Faulcon v. State,* 211 Md. 249, 126 A.2d 858 (1956); *Hounshell v. State,* 61 Md.App. 364, 486 A.2d 789 (1985). Given the fact that most defendants do not announce their intent to kill to witnesses or other third parties, we are forced to look to other factors as reflecting the defendant's intent to kill.

---

**9.** Much of this difficulty is likely based on the fact that the definition of "deliberate" includes the language from the "wilful" definition, just as the definition of "premeditation" includes the phrase "time enough to be deliberate." *See Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830 (1980).

For example, in *Cummings v. State*, 223 Md. 606, 165 A.2d 886 (1960), the Court of Appeals reasoned that the trial judge was justified in finding that the defendant had "a specific purpose and design to kill," based on the fact that "he shot the deceased seven times with a deadly weapon at point-blank range, and then, calmly, laid the pistol on her dead body, stating: 'I might go to jail, but I am glad I done it.' " *Id.* at 611–12, 165 A.2d 886 (involving a scorned lover who shot his paramour after a heated argument). Even if Cummings had not made the statement after shooting his victim, his actions reflected those of an individual who intended to bring about her death. The Court's reasoning, therefore, demonstrates that the circumstances of the death, i.e., the defendant's actions, often speak for themselves when they so clearly involve actions that are likely to bring about death.

So, too, was the situation in the present case. Even though appellant did not use a deadly weapon like the pistol in *Cummings*, the fragile nature of the victim, a six-month-old baby, transformed appellant's hands, and other ordinary objects in the room, into potential deadly weapons given the likelihood of harm that they could cause to the victim. The jury, therefore, could have rationally concluded that appellant's use of his hands or other objects to deliver the fatal blows to Ta'mar's head reflected a "specific purpose and intent to kill." [10]

Similarly, in *Dunn v. State*, 226 Md. 463, 174 A.2d 185 (1961) (involving a man who bludgeoned to death his wife and

---

**10.** Appellant, in his brief, recognized that intent to kill is often proved through the use of a deadly weapon, citing *Hyde v. State*, 228 Md. 209, 179 A.2d 421 (1962) (stab wounds); *Cummings*, 223 Md. 606, 165 A.2d 886 (1960) (seven point-blank range shots from a pistol); and *Faulcon*, 211 Md. 249, 126 A.2d 858 (1956) (dragging a victim under a car). Appellant argues that here, however, intent cannot be proven by means of an implement used to bring about the victim's death. As noted in the text above, we are not persuaded that the absence of a recognized deadly weapon negates the intent element. Instead, we are satisfied that the medical evidence demonstrates that appellant could have used his hands and surrounding objects to inflict the fatal blows, and that if the jurors believed that that was what happened, they could infer an intent to kill from those actions.

18–month–old baby and was tried for the murder of his wife), the Court of Appeals, in determining whether there was sufficient evidence to demonstrate that Dunn had a wilful design to murder, considered the fact that the evidence reflected a clear motivation on Dunn's part for the murder of his wife. *Id.* at 476, 174 A.2d 185. Noting that Dunn was involved with another woman whom he planned to marry, the Court reasoned that it was reasonable for the trier of fact to have concluded that Dunn intended to kill his wife. *Id.*

Although perhaps not as strong a motivation as that involved in *Dunn,* here, the State argued, and appellant concedes in his brief, that appellant's actions could have been motivated by his desire "to quiet the baby." While appellant argues that this phraseology reflects an innocent or innocuous goal on the part of appellant, the jury could have rationally inferred that appellant was tired and frustrated by the sleepless nights and continuous crying, such that he wanted to quiet Ta'mar permanently, *i.e.,* kill Ta'mar.[11]

Finally, in *Faulcon v. State,* 211 Md. at 249, 126 A.2d 858, in which the defendant ran over the victim with a car and dragged him eight blocks to his death, the Court of Appeals affirmed Faulcon's first degree murder conviction, reasoning that the intent to kill could be inferred in part from the fact that the defendant's version of events was contradicted by other witnesses. *Id.* In *Faulcon,* the contradiction centered on whether the defendant had been threatened by the victim before he ran over him. *Id.* The Court concluded that if the trial judge discredited the defendant's version, the existence of legal justification vanished. *Id.*

Like the Court in *Faulcon,* we think that it would have been reasonable for the jury to consider the fact that appellant's

---

11. On this point, appellant argues in his brief that the lack of evidence of past abuse or threats to kill Ta'mar by appellant means that he could not have intended that result on the day in question. As discussed, the evidence supports a finding that appellant's actions on that day were influenced by his lack of sleep and inability to stop Ta'mar's crying, such that it was reasonable for the jury to conclude that he intended to kill Ta'mar by inflicting the four fatal blows.

story contradicted the other evidence. In the present case, if the jurors disbelieved appellant's version of events, they could have rationally concluded, based on the medical evidence, that the only possible explanation was that appellant intended to kill Ta'mar when he inflicted the four fatal blows to his head.

The task of demonstrating that appellant acted deliberately and with premeditation is often treated as a single endeavor.[12] Summarizing the principles espoused in earlier cases, the Court of Appeals, in *Willey v. State*, 328 Md. at 133–34, 613 A.2d 956, explained that, "[i]f the killing results from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." *Id.* (quoting *Colvin v. State*, 299 Md. 88, 108, 472 A.2d 953 (1984) and *Tichnell*, 287 Md. at 718, 415 A.2d 830); *see also Hounshell*, 61 Md.App. at 373, 486 A.2d 789 (explaining that the time between the intention to kill and the act of killing "may be as instantaneous as successive thoughts of the mind") (quoting *Smith v. State*, 41 Md.App. 277, 317, 398 A.2d 426 (1979)). Deliberation and premeditation have also been clarified by the principle that

in order to justify a conviction of murder in the first degree, the trier of facts must find the actual intent, the fully formed purpose to kill with enough time for deliberation and premeditation to convince the trier of facts that this purpose is not the immediate offspring of rashness and impetuous temper, but that the mind has become fully conscious of its own design.

*Cummings*, 223 Md. at 611, 165 A.2d 886 (followed by *Willey*, 328 Md. at 133, 613 A.2d 956).

---

12. There is also some overlap between the wilfulness element and deliberation, as the Court of Appeals has also used the dangerousness of the instrumentality as a factor in determining whether the defendant acted deliberately. *See, e.g., Faulcon*, 211 Md. at 259, 126 A.2d 858. In the present case, a jury could find that an adult man's hands are just as dangerous as an automobile when the victim is a six-month-old baby.

A review of other cases provides support for the conclusion that the evidence presented in this case justifies a finding of deliberation and premeditation, as well as the element of wilfulness. For example, in *Mitchell v. State*, 363 Md. 130, 767 A.2d 844 (2001), the Court of Appeals, discussing the difference between first and second degree murder, explained:

> Although it is true that a murder committed solely on impulse—the "immediate offspring of rashness and impetuous temper"—is not one committed with deliberation and premeditation, the law does not require that deliberation and premeditation be the product of clear and rational thought; it may well result from anger or impulse. The test for first degree murder is whether there was the deliberation and premeditation—sufficient time to reflect—not the quality or rationality of the reflection or whether it may have been emotionally based.

*Id.* at 149, 767 A.2d 844. While appellant argues that the killing, at best, reflects the actions of an emotionally drained and sleep deprived care giver, whose only goal was to have the crying cease, *Mitchell* teaches us that the jury could still have found that appellant acted deliberately and with premeditation despite the fact that he may not have been thinking clearly or rationally because of a lack of sleep and emotional stress, as long as he had time to reflect on his actions.

 Another helpful tool for making this determination comes from this Court's review of a first degree murder conviction in *Hounshell v. State*, 61 Md.App. at 374, 486 A.2d 789. In *Hounshell*, in which the defendant strangled his victim to death, we expressly recognized that "[p]remeditation may be established circumstantially from the facts of a particular murder." *Id.* (citing *Bieber v. State*, 8 Md.App. 522, 261 A.2d 202 (1970)). This principle is especially important given the fact that, "[o]rdinarily, premeditation is not established by direct evidence. Rather, it is usually inferred from the facts and surrounding circumstances." *Hagez v. State*, 110 Md.App. 194, 206, 676 A.2d 992 (1996) (citing *Snyder v. State*, 104 Md.App. 533, 549, 657 A.2d 342 (1995) and *Traverso v. State*, 83 Md.App. 389, 395, 574 A.2d 923 (1990)).

More specifically, *Hounshell* teaches us that "the brutality of the murder act may, in and of itself, provide sufficient evidence to convict for first degree murder." 61 Md.App. at 375, 486 A.2d 789 (citing *Kier v. State*, 216 Md. 513, 523, 140 A.2d 896 (1958) (in which the Court of Appeals focused on the brutal manner in which the victim was beaten about the face and head with certain objects, indicating a protracted period of time during which the assault continued)). Pointing out that "death by strangulation does not in and of itself establish first degree murder," the *Hounshell* Court emphasized that the "jury ... may consider that some time element is necessarily involved between the onset of squeezing the throat and death resulting therefrom." *Id.* at 372, 486 A.2d 789 ("Whether the time required to produce death by strangulation is sufficient for the assailant to reflect upon his actions before death ensues is a matter for the jury to determine."). Ultimately, the Court affirmed the defendant's first degree murder conviction, reasoning that "[t]he time period in which the strangulation of [the victim] must have occurred, and the brutality with which the act was committed, were such that a reasonable juror could have concluded that appellant committed the act with premeditation and deliberation." *Id.* at 376, 486 A.2d 789.

In addition to considering the type of actions involved in committing the murder, it is well established in Maryland that "the firing of two or more shots separated by an interval of time may be viewed as evidence of premeditation." *Tichnell v. State*, 287 Md. 695, 719–20, 415 A.2d 830 (citing *Wilson v. State*, 261 Md. 551, 276 A.2d 214 (1971); *Cummings;* and *Chisley v. State*, 202 Md. 87, 95 A.2d 577 (1953)).[13] In *Braxton v. State*, 123 Md.App. 599, 720 A.2d 27 (1998), we clarified this rule by applying it to a specific set of facts, stating:

---

**13.** This rule has also been extended to other types of murder acts, such as stabbing. *See, e.g., Hyde,* 228 Md. at 216, 179 A.2d 421 ("[T]he nature and number of the deadly blows and the time necessarily required for their infliction amply support a finding appellant had time for premeditation.").

Appellant complains that the evidence of four bullet wounds, including a wound to the head, "cannot standing alone, support a reasoned decision to kill." This assertion is refuted by several cases, including *State v. Raines*, 326 Md. 582, 606 A.2d 265 (1992).

. . .

The case of *Willey v. State*, 328 Md. 126, 613 A.2d 956 (1992), is also instructive. There, the Court observed "that the delay between firing a first and a second shot was enough time for reflection and decision to justify a finding of premeditation and deliberation." *Id.* at 134, 613 A.2d 956 (citing *Tichnell v. State*, 287 Md. 695, 719–20, 415 A.2d 830 (1980) and *Gladden v. State*, 273 Md. 383, 387, 330 A.2d 176 (1974)).

In noticeable contrast to *Raines*, in which only one shot was fired at the victim's head, three out of the four shots fired at Mr. Alexander were directed to a vital part of the body. Thus, the jury could easily infer premeditation and deliberation. The jury also was entitled to consider appellant's fingerprint on the outside of the victim's car door, and ballistic tests showing that the bullets recovered from the victim's body were fired from the gun found in appellant's bedroom.

In essence, Braxton's complaint is that "the jury did not draw the inferences that he wished it to draw." *Hagez*, 110 Md.App. at 205, 676 A.2d 992. He overlooks that it is the function of the jury to decide what inferences to draw from proven facts. *McMillian v. State*, 325 Md. 272, 290, 600 A.2d 430 (1992); *Hagez*, 110 Md.App. at 205, 676 A.2d 992. The jury was certainly entitled to infer from the facts that "the defendant possessed the intent to kill (wilful), that the defendant [had a] conscious knowledge of that intent (deliberate), and that there [was] time enough for the defendant to deliberate, i.e., time enough to have thought about that intent (premeditate)." *Willey*, 328 Md. at 133, 613 A.2d 956.

*Id.* at 658–59, 720 A.2d 27.

Our discussion in *Braxton* reminds us that our task is not to determine whether there were other permissible inferences

that the jury could have made. Instead, we must ensure that the evidence supports a finding that the elements of the crime existed beyond a reasonable doubt. *See also Tichnell,* 287 Md. at 719, 415 A.2d 830 (explaining that the jury is not obligated to believe the defendant's version of events, but is permitted to draw its own conclusions based on the other evidence presented).

Before applying these rules to the facts of the present case, we are mindful of one final guiding principle, that being that the existence of the three elements necessary to support a first degree murder conviction must be "discerned from the facts of the case." *Id.* at 718, 415 A.2d 830; *see also Hyde,* 228 Md. at 216, 179 A.2d 421; *Faulcon,* 211 Md. at 258, 126 A.2d 858.

Applying these principles to the facts of this case leads us to hold that there was sufficient evidence presented from which the jury reasonably could conclude that appellant acted with deliberation and premeditation in killing Ta'mar. The jury was not required to accept appellant's version of events, especially given that much of the evidence presented by the State demonstrated how his story was inconsistent with the medical evidence. Nor was the jury obligated to conclude from the testimony of other witnesses and from the medical evidence that appellant's actions could not have been done with the deliberation and premeditation necessary to support a conviction for first degree murder.

Like the defendant in *Braxton,* appellant argues that evidence about the nature of the injury suffered by the victim is insufficient to support his first degree murder conviction. We disagree. The medical testimony presented by Dr. Walker and Dr. Pestano clearly established that Ta'mar suffered four fatal blows to his head, involving violent force similar to the force involved when a person is thrown through the windshield in a car crash or falls from a third floor window. Both doctors also discounted other possible causes of his fatal injuries, emphasizing that such injuries were not likely to be the result of an accidental knock on the head during attempts to resusci-

tate or even the alleged mishandling of Ta'mar by his father when he arrived at Ms. Pinkney's home in his car seat.

Accepting that it was permissible for the jury to use circumstantial evidence to establish the elements of first degree murder, the nature and number of the deadly blows to Ta'mar's head, in the context of all other evidence, supports a finding of deliberation and premeditation. Like the Court of Appeals in *Hyde v. State*, we believe that the evidence supports the jury's conclusion that appellant possessed the necessary mental state and amount of time to reflect on his actions in a manner consistent with a deliberate and premeditated killing.

Even though our decision to affirm rests on our application of case law discussing Maryland's first degree murder statute, we take a moment to briefly address appellant's alternative argument that his first degree murder conviction should be reversed because there is no Maryland case in which an otherwise caring, responsible care giver has been convicted of the premeditated, deliberate, first degree murder of a child, when death resulted from a single incident. Appellant attempts to support his argument by highlighting cases involving child abuse death in which the defendants were convicted of second degree murder, at worst,[14] suggesting that second

---

14. *See Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125 (1999) (affirming the defendants' second degree murder and child abuse convictions when the evidence indicated that the nine-year-old girl died from dehydration and malnutrition, but also revealed numerous severe injuries such as bruises, abrasions, bleeding of the brain, and rib fractures); *Simpkins v. State*, 88 Md.App. 607, 596 A.2d 655 (1991) (affirming parents' second degree murder convictions when their two-year-old daughter died of starvation); *Duley v. State*, 56 Md.App. 275, 467 A.2d 776 (1983) (affirming a father's child abuse and involuntary manslaughter convictions when the evidence suggested that the defendant hit his infant baby hard enough to break her ribs and shook her hard enough to rupture the blood vessels in her brain); *Moore v. State*, 15 Md.App. 396, 291 A.2d 73 (1972) (affirming the second degree murder conviction of a step-father for killing his step-daughter during what he claimed was a spanking incident, but where the medical evidence showed that she died from a direct injury or blow to the head); *Dyson v. State*, 6 Md.App. 453, 251 A.2d 606 (1969) (affirming a second degree

degree murder was the appropriate verdict here given that the killing of Ta'mar was no worse than those murders where the defendant was convicted of second degree murder.

Appellant does acknowledge at least one first degree murder conviction stemming form the physical abuse of a child but tries to distinguish it from the present case on its facts. Appellant's discussion of *White v. State*, 318 Md. 740, 569 A.2d 1271 (1990), a case in which a mother was convicted of first degree murder and child abuse after she and her boyfriend caused the death of her four-year-old daughter by beating her over a five-day period, resulting in 40 to 50 separate blows to her body, focuses solely on the fact that the death did not result from a single incident. The case does not have precedential effect in any event because the defendant in White did not challenge the murder conviction in the Court of Appeals but only argued that the child abuse conviction should have merged into the murder conviction. This Court, in an unreported opinion, affirmed both convictions.

We also note that there are at least two other examples in which Maryland appellate courts affirmed first degree murder convictions for parents' murder of their children. Both of the cases involved a single, violent episode resulting in the child's death.[15] In neither case was sufficiency of the evidence raised

murder conviction of a father for maliciously inflicting corporal punishment upon his three-year-old daughter).

**15.** *See Pouncey v. State*, 297 Md. 264, 465 A.2d 475 (1983) (involving a mother who was convicted of first degree murder for killing her five-year-old son, when the evidence disclosed that she drowned him because she thought that the devil was pursuing him and the only way to prevent him from going to hell was to kill him); *State v. Johnson*, 143 Md.App. 173, 794 A.2d 654 (2002) (a father, who had a history of drug abuse, stabbed and decapitated his 13–month–old child and was convicted of first degree murder). In *Pouncey*, the defendant argued, on appeal, that she could not be found guilty of first degree murder and insane. 297 Md. at 265, 465 A.2d 475. The Court of Appeals affirmed, reasoning that a finding of insanity simply relieved the defendant of criminal liability but did not mean that the court could not enter a guilty verdict and impose other non-criminal consequences. *Id.* at 269–70, 465 A.2d 475. In *Johnson,* a post conviction proceeding, we had

and addressed in a reported opinion, however. As previously discussed, we reach our conclusion that the evidence in this case was legally sufficient by applying the elements of the crime to the evidence. The cases just discussed are by no means authority to support a contrary conclusion.

Finally, we comment on appellant's attempts to argue for reversal of the first degree murder conviction by attempting to demonstrate that courts in other jurisdictions have been hesitant to convict a defendant of first degree murder in the death of a child.[16] For the following reasons, we do not find appellant's argument to be persuasive.

Appellant's conviction was based on Maryland's first degree murder statute, just as our review is governed by Maryland cases interpreting that statute. Courts from other jurisdictions are not bound by our statutes or case law, and thus, their analyses of similar issues may vary based on those differences. Additionally, with respect to legal sufficiency, cases turn on their facts. We have made no attempt to research and compare cases from other jurisdictions because we believe Maryland case law supports our conclusion. We are always cognizant of the fact that every jury is different, and that, in the end, it is our job, "after viewing the evidence in the light most favorable to the prosecution, [to determine whether] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That

---

affirmed the defendant's conviction on direct appeal, in an unreported opinion. 143 Md.App., at 175, 794 A.2d 654.

**16.** Appellant cites *Commonwealth v. Woodward*, 427 Mass. 659, 694 N.E.2d 1277 (1998) (the court affirmed the trial judge's reduction of the defendant's conviction from second degree murder to involuntary manslaughter, reasoning that the evidence did not support a finding of malice), and *State v. Brown*, 836 S.W.2d 530 (Tenn.1992) (holding that the evidence was insufficient to support a first degree murder conviction when the defendant's four-year-old son suffered two or three skull fractures during a fight between the defendant and his wife, reasoning that evidence of the repeated blows was not sufficient, by itself, to establish first degree murder, given the fact that they could have been delivered in the heat of passion).

is exactly what we have done here, and we conclude that there was sufficient evidence from which the jury could have determined that appellant was guilty of first degree murder. We reach this conclusion based on the totality of the evidence, including permissible inferences.

We expressly do not adopt a bright line rule of legal sufficiency for first degree murder, based solely on the number of blows delivered. We merely hold that the evidence was legally sufficient to convict appellant of first degree murder for the death of a six-month-old child based on the totality of the evidence, including evidence as to the number, severity, and brutality of the blows, the circumstances leading up to the beatings, and appellant's version of events.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

Concurring Opinion by DAVIS, J. joined by BLOOM, THEODORE G., J. (retired, specially assigned).

I concur in the result reached by the majority only because I perceive no error of law in the charge to the jury or in the verdict rendered by the jury under Maryland law as presently constituted. I write separately, however, because, in my view, appellant's conviction resulted from an obfuscation which has developed in the law between first degree and second degree murder and the likely failure of the jury to comprehend the concept that an intent to prevent the infant from crying is insufficient to sustain a verdict of murder in the first degree.

Six-month old Ta'mar Hamilton certainly deserved better. As the majority points out, his birth was premature, requiring medical assistance to facilitate breathing; he was treated with antibiotics for pneumonia when he was three months old; autopsy results revealed a healing rib fracture indicating injuries sustained prior to his fatal injuries; and the force employed in causing his ultimate death was so violent that it was the equivalent of that which occurs when one is thrown through the windshield in a car crash or falls from a third floor window. There was no serious contest, at trial, regard-

ing criminal agency. It can be fairly said that appellant was not well served by his failure to be forthcoming and a defense strategy that, in hindsight, appears to have been disingenuous and strained credulity.

To be sure, on the evidence presented, a finding of guilt of at least murder in the second degree and imposition of a severe sentence were clearly warranted in this case. Moreover, I recognize that, given the present state of Maryland law on felonious homicide, it was within the province of the jury, armed with the ability to consider inferences and the circumstances surrounding the death of young Ta'mar to conclude that, exasperated at his inability to force the young child to stop crying, he would kill young Ta'mar as the only means to achieve the desired end. The majority quotes from *State v. Smith*, 374 Md. 527, 823 A.2d 664 (2003), No. 91, September Term, 2002 (filed May 9, 2003), in which the Court of Appeals observed that "the following cases further emphasize a trial judge's or a jury's ability to choose among differing inferences that might possibly be made from a factual situation and the deference we must give in that regard to the inferences a fact[ ]finder may draw."

Consequently, absent clear error in its fact-finding, an appellate court is required, in deference to the fact finder, to accept those findings of fact. I wholeheartedly subscribe to the proposition espoused in *Smith* because it would be improper for this Court to engage in appellate fact-finding when a *possible* ultimate decision was, in fact, supported by evidence or inferences and circumstances properly deducible from that evidence. The majority opinion, with great clarity, makes the point.

All of the foregoing having been said, we must not lose sight of the principal focus in any criminal prosecution, i.e., the *mens rea* or mental state that determines the degree of culpability, except in those offenses as to which the requirement of proof of *scienter* is expressly obviated by statute. The heart-rending circumstances surrounding the short life and death of young Ta'mar have the tendency of causing the

jury to shift the focus from the culpability and accountability of the criminal agent to the well-settled inference that the fact finder may take into account the nature of the injuries in determining the intent of the actor.

Although the proceedings in the lower court may not have run afoul of Maryland law as presently constituted, the extent and heinous nature of the injuries would naturally tend to inflame the passions of the jury and permit it to discern intent solely from the evidence of those injuries, totally disregarding other circumstances consistent with the theory that appellant may have acted in a wild, frenetic state, rather than a state of mind which is rational, cool, and reflective. My second concern is that, on the facts of this case, the jury may have been confused in its deliberations, as a result of the emphasis on appellant's stated goal, i.e., to make the infant stop crying, and thereby rendered a verdict of first degree murder without determining that appellant's conduct was "willful" in the sense of intending to kill the child.

The expansive definition of the nature and character of the reflection of one who kills renders virtually all homicides, when there is any period of time prior to the killing, murder in the first degree in the absence of excuse, justification, or mitigating circumstances. With respect to the evidence of intent to kill, I am constrained to conclude that, because under Maryland law, intent may be inferred almost exclusively from the nature of the injuries inflicted, it was within the province of the jury in the case *sub judice* to return a verdict of murder in the first degree. A fully formed intent to kill and evidence of *true* reflection—that one made the decision (even in a split second) between the choice to kill or not to kill—in my view, are incompatible with circumstances which establish that the killer did not act rationally, i.e., he or she was robbed of his or her mental faculties such that he or she was incapable of forming the intent to kill.

The jurors, in the case at hand, deliberating under the current state of Maryland law, could properly find that appel-

lant "reflected" even if they believed his actions were not the product of a rational thought process, i.e., appellant was robbed of the ability to form the requisite intent. Consequently, although the majority opinion accurately sets forth the law as presently constituted and the jury returned its verdict pursuant to the law as instructed, appellant's conviction of first degree murder, in my judgment, resulted from the blurred demarcation between first and second degree murder which has developed in Maryland over the past three decades. Impulsive and rash behavior evidencing lack of ability to formulate the requisite specific intent should not be recognized as the basis for a conviction of murder in the first degree.

With respect to the extensive injuries sustained by Ta'mar, the majority opinion relies principally on *Hounshell v. State*, 61 Md.App. 364, 375, 486 A.2d 789 (1985), in which the victim was strangled to death and *Kier v. State*, 216 Md. 513, 140 A.2d 896 (1958), in which the Court of Appeals had characterized the victim as having been beaten in a "brutal manner" about the face and head with objects that indicated a protracted period during which the assault continued. Noting that the assailant had procured a butcher knife and plunged it twice into the body of the victim, the Court concluded, in *Kier*, that there was ample evidence to justify the jury in its conclusion that the action of the appellant was willful, deliberate, and premeditated. *Kier*, a bench trial, considered the proof of premeditation and deliberation in a case in which the victim had been found by her husband with many lacerations and bruises about her face, the back of her head, and other parts of her body. The most serious wounds, apparently inflicted by a butcher knife, were one in her throat and another in her chest extending some seven inches through the chest cavity to the heart.

*Kier* and *Hounshell*—as is true with virtually all of the cases cited by the majority—involve the slaying of victims wherein the nature of the injuries are not juxtaposed to

circumstances which are inconsistent.[1] Appellant, in his written submission to this Court, refers us to *People v. Anderson*, 70 Cal.2d 15, 73 Cal.Rptr. 550, 447 P.2d 942 (1968), in which the Supreme Court of California, discussing proof of the elements of first degree murder, concluded:

The type of evidence which this court found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1)facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing "was the result of pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed"[;] (3) facts about the nature of the killing from which the jury could infer *[The m]anner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).*

(Third emphasis added; citations omitted.)

More to the point, it is stated in the treatise of W. LaFave & A. Scott, *Criminal Law* § 7.7(a) at 645 (2d ed.1986), that "[t]he mere fact that the killing was attended by much violence or that a great many wounds were inflicted is not relevant in this regard [establishing premeditation], as such a killing is just as likely (or perhaps more likely) to have been on impulse." The majority makes the point, citing *Mitchell v.*

---

1. Appellant, as a step-grandfather caring for the infant for only two days over the Thanksgiving holiday, did not seek to absolve himself of the long-term care of the child, a circumstance which undermines the theory he wanted the child dead.

*State*, 363 Md. 130, 767 A.2d 844 (2001), that the test for first degree murder is not the quality or rationality of the reflection in determining deliberation and premeditation or *whether it may have been emotionally based.* The discussion in *Mitchell* centered on whether the elements of premeditation and deliberation were established by the agreement in a conspiracy to commit murder in the first degree as to the non-shooter. The Court of Appeals concluded:

> We are unable to follow the metaphysical analysis of [*United States v.] Chagra* [, 807 F.2d 398 (5th Cir.1986)] or the intermediate appellate court in this case, that spontaneity or acting on impulse can, at the same time, suffice to establish an agreement to murder but not suffice to constitute the deliberation and premeditation that distinguishes first [degree murder] from this form of second degree murder, as we have defined those concepts.

*Id.* at 149, 767 A.2d 844.

The cases cited by the majority for the proposition that appellant's emotional state does not preclude a finding that he acted deliberately and with premeditation involve homicides in which the circumstances do not provide an alternative theory that not only is more plausible, but which, from the point of view of the lay jury, could reasonably have been endorsed by the State. In that regard, the State, in its closing argument said:

> Now the last form of homicide that the judge instructed you on is first degree murder. It's basically second degree murder with two additional element[s], were the defendant's actions deliberate and were they premeditated[?]

> Deliberate means, was the defendant conscious of his intent to kill[?] Well let's look at this [sic] actions, *he had tried so many different things to get Ta'mar to stop crying and he couldn't do it, and he was frustrated and he was tired. And he wanted to do something that would stop his crying.* He didn't do something that didn't coincide with what his goals were. *So he was conscious of his goal, his goal was to quiet the baby.* So he took Baby Ta'mar and

slammed his head into a bed rail. He knew exactly what he was doing, he was conscious of his intent.

The last element is premeditation. Now people tend to think of premeditation as laying in wait, as plans that go in [sic] for weeks in advance, conspiracy, and all of those things are premeditation. But you don't need time, a significant amount of time for premeditation. You don't need a plan, you don't write out a list [of] things to do. You just need a small amount of time so that you can make the decision whether or not to kill.

*One, two, three, four. (Indicating.) Between any of those blows the defendant had the opportunity to decide, stop or continue. He chose to continue, he premeditated to kill Ta'mar Hamilton and intended to kill him.*

Ladies and gentlemen, *what this case really comes down to, the key issue of this case is did [appellant] kill Ta'mar Hamilton . . . .*

At the *in banc* hearing before this Court, it was elicited that the prosecutor, at one point, argued to the jury that the evidence supported the State's theory that it was appellant's intent to kill young Ta'mar, rather than simply to stop him from crying. A review of the prosecutor's argument reveals that its principal thrust was that appellant was attempting to stop the young child from crying and death ensued from acts that were wanton and demonstrated a disregard for human life. Such a finding would be quintessentially depraved heart second degree murder under Maryland law.

Judge Wilner, writing for the Court of Special Appeals in *Simpkins v. State,* 88 Md.App. 607, 611–12, 596 A.2d 655 (1991)[2] (citing *Robinson v. State,* 307 Md. 738, 745, 517 A.2d 94 (1986)), explained:

A depraved heart murder is often described as a wanton and wilful killing. The term "depraved heart" means something more than conduct amounting to a high or unreason-

---

**2.** I recognize that the conduct in *Simpkins* was based on neglect; however, the decision contains an in-depth discussion of "intent."

able risk to human life. The perpetrator must [or reasonably should] realize the risk his [or her] behavior has created to the extent that his [or her] conduct may be. termed wilful. Moreover, the conduct must contain an element of viciousness or contemptuous disregard for the value of human life which conduct characterizes that behavior as wanton.

The *Simpkins* Court, discussing the element of intent, further explained:

But intent again will be found to resolve itself into two things; foresight that certain consequences will follow from an act, and the wish for those consequences working as a motive which induces the act. The question then is, whether intent, in its turn, cannot be reduced to a lower term. Sir James Stephen's statement shows that it can be, and that knowledge that the act will probably cause death, that is, foresight of the consequences of the act, is enough in murder as in tort.

*Id.* at 619, n. 1, 596 A.2d 655 (quoting O. Holmes, *The Common Law* (1881) at 53).

The *Simpkins* Court traced the development of English and American decisions that involved the withholding of sustenance from. a young child and under what circumstances an intent may be found to elevate the offense from manslaughter to depraved heart second degree murder or first degree intent-to-kill murder. In the cases cited, when the actor intended the act, the natural consequences of which subjected the victim to a high or unreasonable risk to human life, although death was not intended, the cases generally hold that the defendant is guilty of depraved heart second degree murder. When the defendant intended for the withholding of sustenance to result in death, the offense committed is clearly first degree murder.

From the above, establishing that appellant intending for death to occur is indispensable to a finding of first degree murder. For that reason, emphasis should have been placed on the distinction between intending an act, the natural conse-

quence of which involved a risk of death and intending that death occur as a means of causing young Ta'mar to stop crying, notwithstanding that the trial court properly instructed the jury that "willful means that the defendant actually intended to kill the victim." Ordinarily, this instruction would have sufficed to inform the jury as to how to determine whether the evidence supported a finding of first degree murder.

The prosecutor, however, took great pains to make the point that appellant "wanted to do something that would stop his crying" and "he was conscious of his goal, his goal was to quiet the baby." The prosecutor then told the jury that appellant "slammed Ta'mar's head into the bed rail and that he knew exactly what he was doing, he was conscious of his intent." At that point in the prosecutor's argument, the intent to which she referred is to stop young Ta'mar from crying. The jury could have very easily been misled if it believed that appellant acted only with the intent to prevent young Ta'mar from crying, but that he did not intend for the baby to die. Under such circumstances, the appropriate verdict should have been depraved heart second degree murder.

It is certainly within the province of the jury to come to its own conclusions as to what the circumstances reveal about appellant's mental state; however, the emphasis by the prosecutor on what appellant's "goal" was enhances the likelihood that the jury was confused because, notwithstanding dissembling by appellant, there were no circumstances extrinsic to the criminal act itself that indicated that appellant wished the baby dead. The only motive ascribed to appellant is that he wanted the baby to stop crying. The possibility existed that appellant intended to kill the young victim as a means to prevent him from crying. The more plausible explanation, however, is that, in a frenetic state, appellant applied force with little thought of the consequences. Great pains, in my view, should have been taken when such emphasis was placed on stopping the baby from crying as the stated "goal" in order that it be crystal clear that the jury must find that the "goal" was to kill the infant, not merely to stop him from crying. It

was incumbent on the court to insure that there was no confusion as to the point.

As I have acknowledged, it was within the province of the jury, based on the evidence, direct and circumstantial, and inferences deducible therefrom, to conclude that appellant *possibly* intended to kill young Ta'mar. My concern is whether, in a case when there had been articulated (and the prosecutor had reinforced) an intent other than to kill the young child, the distinction between an intent to kill and the intentional commission of an act, the nature of which is likely to cause death, may very well have become blurred.

Judge Charles E. Moylan, Jr., formerly of this Court, in his treatise, *Criminal Homicide Law*, traces the definitions of "willful," "deliberate," and "premeditated" to Hochheimer who, in turn, based his definitions on the Pennsylvania Act of 1794. For "interpretive guidance," according to Judge Moylan, Hochheimer looked to a single Pennsylvania decision, *Commonwealth v. Drum*, 58 Pa. 9 (1868). In delineating the distinction between first degree and second degree murder, the *Drum* decision concluded:

A learned judge (Judge Rush, in *Commonwealth v. Richard Smith*) has said: "It is equally true both in fact and from experience, that *no* time is too short for a wicked man to frame in his mind his scheme of murder, and to contrive the means of accomplishing it." But this expression must be qualified, lest it mislead. It is true that such is the swiftness of human thought, that no time is so short in which a wicked man may not form a design to kill, and frame the means of executing his purpose; yet this suddenness is opposed to premeditation, and a jury must be well convinced upon the evidence that there was time to deliberate and premeditate. The law regards, and the jury must find, the actual intent; that to say, the fully formed purpose to kill, with so much time for deliberation and premeditation, as to convince them that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. If there be time to frame in the mind, fully and consciously, the inten-

tion to kill, and to select the weapon or means of death, and to think and know beforehand, though the time be short, the use to be made of it, there is time to deliberate and to premeditate.

*Id.* at 18 (footnote omitted).

The *Drum* decision, as is true with much of the scholarship regarding the law of first and second degree murder, discusses the time required for there to be the fully-formed purpose to kill and for deliberation and premeditation. In the case at hand, my position, unlike the dissent which focuses on the element of premeditation, is that the length of time, standing alone, should not be determinative of whether the jury could find from the facts and circumstances "the actual intent ... the fully formed purpose to kill...." An act evidencing a non-homicidal intent may be sustained over an extended period of time, despite the fact that it demonstrates a wanton disregard for human life. Appellant's actions were more likely "the immediate offspring of rashness and impetuous temper, ..." and the mind has not "become fully conscious of its own design." In other words, the instant case, I believe, is devoid of the qualitative, rather than the quantitative, element of reflection. Aside from the extensive injuries inflicted, all of the extrinsic circumstances tend to belie a contention that appellant harbored an intent to kill Ta'mar.

With respect to the requisite elements of first degree intent-to-kill murder, Judge Chasanow, writing for the Court of Appeals in *Willey v. State,* 328 Md. 126, 133, 613 A.2d 956 (1992)(quoting *Tichnell v. State,* 287 Md. 695, 717–18, 415 A.2d 830 (1980)), explained:

For a killing to be "wilful" there must be a specific purpose and intent to kill; to be "deliberate" there must be a full and conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time.

In discussing a homicide scheme [3] similar to that in Maryland, Leo Romero at 18 N.M. L.Rev. 73 (1988), observed at 74:

> An intentional homicide includes only those killings where the actor desires the death of another human being; it does not include a killing where the actor acts intentionally but without the purpose of bringing about death. For example, a person who intentionally shoots at the victim to scare him [or her], but without intending the result of death, does not commit an intentional homicide if the discharge should hit the victim and the victim should die. Even though the act causing death, the shooting, was intentional, the killing amounts to an unintentional homicide because the person did not intend the consequence of death. Hence, it is important to distinguish between intentional shooting and intentional killing.

(Footnotes omitted.)

The author speaks to a further concern presented by the case at bar:

> ... The more reprehensible the homicide, the greater the punishment the killing should warrant. The grading of

---

**3.** The New Mexico statute provides:
> A. **Murder in the first degree** is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused:
> (1) by any kind of willful, deliberate and premeditated killing;
> (2)in the commission of or attempt to commit any felony; or
> (3) by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life.
> Whoever commits **murder in the first degree** is guilty of a capital felony.
> B. Unless he [or she] is acting upon sufficient provocation, upon a sudden quarrel or in the heat of passion, a person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he [or she] knows that such acts create a strong probability of death or great bodily harm to that individual or another.
> Murder in the second degree is a lesser included offense of the crime of **murder in the first degree.**
> Whoever commits murder in the second degree is guilty of a second degree felony resulting in the death of a human being.

homicides on the basis of relative seriousness also reflects differences in stigma and moral wrongdoing.

Although all homicides are in some sense different, the division of homicides into categories should be based on principled, clear, and workable distinctions. Distinctions are principled in the sense that first degree murder includes killings that are more heinous than those killings encompassed by second degree murder. Distinctions are clear to the extent that they meaningfully differentiate the two degrees of murder; for example the line between murder in the first degree and murder in the second degree should be clearly recognizable. *Finally, distinctions are workable if the lines between the different classifications are understandable by a jury of lay people in applying the distinctions and determining the degree of homicide.* Because the different classifications of homicides should reflect differences in culpability, culpability terms should be defined precisely to clarify the distinctions.

(Footnote omitted; emphasis added.)

The above quotation is clearly a plea for some sense of moral relativism in the law of homicide. Currently, one can act almost spontaneously in an emotional or frenzied state and nevertheless be subjected to a conviction for first degree murder based solely on a theoretical instantaneous period of reflection and the nature of the injuries inflicted. At the same time, one whose actions are more calculating may be deemed to be guilty only of second degree murder as a consequence of the number and nature of the injuries sustained.

Apropos the instant case, no difference in culpability or moral accountability is imputed to appellant, who admittedly committed a heinous act, than to one who commits a murder for hire or one who murders in the course of conducting a criminal enterprise. As despicable as appellant's conduct was, it cannot be equated with that of a professional killer or, for that matter, one who conceives of a calculated scheme to

murder a child.[4]

The majority dismisses appellant's argument that no Maryland case in which an otherwise caring, responsible care giver has been convicted of the premeditated, deliberate first degree murder of a child when death resulted from a single incident. The majority notes that appellant cites three cases, *Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125 (1999), *Simpkins v. State, supra,* and *Duley v. State*, 56 Md.App. 275, 467 A.2d 776 (1983), as cases in which heinous injuries were suffered by the child victims, but in which the defendants were convicted of either second degree depraved heart murder or manslaughter. Because each case must be decided on its own facts, I do not accept appellant's argument that reversal is warranted simply because there is a paucity of cases that are factually similar in which a first degree murder conviction was rendered. Often, it is the prosecutor's office that decides to pursue only second degree depraved heart murder as the flagship count in the indictment.

Although the distinction between murder and manslaughter is generally discernible by a jury with the aid of instructions from the court, the distinction between second degree and first degree premeditated murder often confounds juries. As a result, a defendant is subject to the vagaries of the charging process as well as confusion by lay persons on the jury.

Judge Chasanow, writing for the Court of Appeals in *Willey,* referred to the confusion resulting from the lack of clarity as to the definition of premeditation:

[I]t would be preferable, especially *where the distinction is clearly at issue,* for the trial court to emphasize that in order for the jury to conclude that the defendant premeditated the killing it must find that the defendant had sufficient time to consider the decision whether or not to kill and weigh the reasons for or against such a choice. Movement in this direction would be consistent with the developing

---

4. *Cf. State v. Smith*, 322 S.C. 215, 471 S.E.2d 462 (1995), in which the defendant, Susan Smith, ostensibly murdered two sons because she believed them to be obstacles to liaison with prospective suitor.

trend of courts and commentators to focus more attention upon, and more clearly define, the distinct mental states involved in first versus second degree murder.

*Willey,* 328 Md. at 138, 613 A.2d 956 (emphasis added).

Although I agree with the observation by the *Willey* Court that there needs to be greater clarity with respect to the distinct mental states involved in first versus second degree murder, my concern in the case *sub judice* does not pertain, principally, to whether there was sufficient time to premeditate but, rather, only whether the jury was confused as to the character of the reflection required and its mandate to return a first degree verdict only if it found from the evidence an intent to kill. I recognize that the time it took to inflict the injuries in this case is more than sufficient to satisfy the element of premeditation as to length of time. Whether the killing was deliberate is intertwined with the intent to kill because one certainly cannot be conscious of an intent to kill if there is no intent to kill. Thus, although the potential jury confusion to which I address my concern is the intent to kill, it logically follows that, if there is jury confusion as to the evidence of intent to kill, then there also can be no consciousness of that intent and, *ergo,* the killing cannot be deliberate.

Judge Moylan, writing for this Court, discusses the interrelationship of the requisite elements of first degree murder in *Smith v. State,* 41 Md.App. 277, 300, 398 A.2d 426 (1979):

Do the three adjectives "wilful," "deliberate" and "premeditated" describe three distinct aspects of the mental state we are searching for or are they, as a rhetorical device for purposes of emphasis, simply three synonyms for the same mental state? Do the second and third adjectives add anything whatsoever to the first? Can there be "a specific purpose and design to kill" without "a full and conscious knowledge of the purpose to kill"? How does one have purpose without being conscious of that purpose? To wit, can an act be "wilful" and not "deliberate"? By the same token, does the third adjective add anything to the second?

How can one be "deliberate" without having had "time enough to be deliberate"?

I acknowledge, as I must, that although the more plausible explanation for appellant's actions is that, exacerbated and in a frenetic state, he engaged in conduct that evidenced a contemptuous disregard of the value of human life, the jury was entitled to find from the direct and circumstantial evidence and the inferences properly deducible therefrom that appellant employed lethal force to kill the infant as a means to stop him from crying. The potential for confusion by the jury, in my judgment, could only have been addressed by drawing its attention specifically to the fact that a *mens rea* simply bent on stopping the baby from crying is insufficient to sustain a conviction for murder in the first degree. As to punishment, a sentence of thirty years' imprisonment, consecutive to the life imprisonment sentence for first degree murder, was imposed for child abuse. Had the jury returned a verdict of murder in the second degree, appellant's exposure would have been in the aggregate, assuming consecutive sentences, sixty years' imprisonment. The sentence for second degree murder would have differentiated appellant's punishment from that reserved for killers who clearly intend to kill their victims pursuant to a discernible design.

SONNER, J., dissenting.

For better or worse, our law separates first degree murder from other killings based on the decision to kill in advance of the act. It is a separation for judges and lawyers to examine, understand, and explain to the jury. And when any evidence of first degree murder is presented, the trial judge, in the first instance, and as a matter of law, must determine whether the evidence could persuade a jury to convict. *See Hebron v. State,* 331 Md. 219, 232, 627 A.2d 1029 (1993). The judge cannot let a case go to the jury if there is only a morsel of evidence; there must be enough to allow a jury to jump the hurdle of reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 320, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The jury, on the other hand, is the sole judge of facts. *Hebron,* 331 Md. at

233, 627 A.2d 1029. But just because juries have that power does not permit them to evaluate murders to determine which are the worst and then pick the degree of crime. This delegation of a judicial responsibility to a jury is exactly what the majority condones, and what causes me to dissent.

First, let me make clear that I agree with the majority's opinion concluding that Pinkney barely preserved the sufficiency issue. He was vague as to just how the State's evidence failed. I also agree that we would be mistaken to use that shortcoming to evade deciding the important issue presented. Moreover, I understand that the State can prove all of the elements of first degree murder with circumstantial evidence, and I accept the majority's definition of first degree murder. Lastly, I have no quarrel with the conclusion that sufficient evidence existed to show Pinkney was the perpetrator. My concern, instead, is that we have affirmed a conviction for first degree murder when there has been no showing, indeed, no real focus at trial, of Pinkney's premeditation to commit the fatal acts.

The tortuous history of the law of homicide in Maryland, and throughout the United States, can cause present day confusion and can lead to inconsistent application. This dissent is not the proper place to describe that history, or even to describe the apparent confusion.[1] For my purposes, it is sufficient to work with accepted definitions of the crime:

---

1. Judge Charles E. Moylan, Jr., has done so in his recent publication, CRIMINAL HOMICIDE LAW (2002). He expertly describes the disordered case law and developing milestones that have emanated from the appellate review of murder cases in Maryland. In particular, Judge Moylan traces the roots of the words "wilful," "deliberate," and "premeditated," and remarks:

 *Chisley* [*v. State*, 202 Md. 87, 95 A.2d 577 (1953)], [*Lewis*] *Hochheimer* and *Commonwealth v. Drum* [, 58 Pa. 9 (1868)] all define "wilful" as connoting that "there must be a specific purpose and design to kill." That is, *ipso facto*, a specific intent to kill. [They] go on to define "deliberate" as "there must be full and conscious knowledge of the purpose to do so...." Both the notions of "wilfulness" and of "specific intent" embrace "consciousness" and "knowledge" and "purpose." A purposeless act is, by definition, an act

For a killing to be "wilful" there must be a specific purpose and intent to kill; to be "deliberate" there must be a full and conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate.

*Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830 (1980).

To sustain a guilty verdict of first degree murder, there must be some evidence from which the jurors could have found *beyond a reasonable doubt* "the actual intent, the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince them, that this purpose [wa]s not the immediate offspring of rashness and impetuous temper and that the mind ha[d] become fully conscious of its own design." *Chisley v. State*, 202 Md. 87, 106, 95 A.2d 577 (1953) (citation omitted). The presence of deliberation and premeditation must be judged from the facts of each case because there is no particular length of time during which they "shall have been conceived or have existed." *Id.*

I agree that there was sufficient evidence to show Pinkney's intent to kill; Ta'mar's head injuries supply that. But the State produced nothing at trial to show that Pinkney's mind had become "conscious of its own design," that there was "a choice made as the result of thought." *See Chisley*, 202 Md. at 106, 95 A.2d 577 (citation omitted). There is nothing in the record to show that there was deliberation for any period, long or short, any struggle, that is, between the intention to kill and the act.

---

without a specific intent. One cannot entertain a specific intent unknowingly or unconsciously.

There is finally "premeditated," which *Chisley* and *Hochheimer* define by stating that "the design must have preceded the killing by an appreciable length of time, time enough to be deliberate." When there is deliberation, there has been, of necessity, time for deliberation, to wit, "premeditation." One cannot deliberate without having had time to deliberate. If there has been no premeditation, there cannot have been deliberation.

*Id.* at 51–52.

As Judge Rodowsky explained in *Ferrell v. State,* 304 Md. 679, 688, 500 A.2d 1050 (1985):

[U]nder the Maryland statute and this Court's decisions premeditation is something more than forming an intent to kill. . . . Professor Perkins goes so far as to say that "[t]he notion that a fully formed intent is always deliberate and premeditated, no matter how short the time between the first thought of the matter and the execution of the plan, is preposterous."

(Quoting Perkins, *The Law of Homicide,* 36 J.Crim. L. & Criminology 391, 449 (1946)); *see also Willey v. State,* 328 Md. 126, 613 A.2d 956 (1992) (upholding jury instruction distinguishing first and second degree murder and commenting "the judiciary would do well to clarify, rather than minimize, the existing distinctions between Maryland's two degrees of intent-to-kill murder").

The State's theory of the case at trial, as expressed in its closing argument, bears out the absence of premeditation. As the concurring opinion recognizes, the State proceeded on the implicit theory that the killing was of the depraved heart variety. Its approach was not that Pinkney planned the murder, or even thought about it in advance, but, rather, that he carried it out in a rage that burst forth from utter frustration. Essentially, the State asked the jury to return a verdict based upon facts that would support a depraved heart murder, as if those facts supported first degree murder.

Pinkney, for his part, asserted a defense that he did not inflict the fatal injuries, not that he was guilty only of a lesser degree of homicide. That was certainly an understandable strategy. The double defense of having Pinkney maintain that he did not inflict the injuries, while simultaneously defending that he did not deliberate before inflicting the same injuries would not carry much chance of success with a jury. Each defense would weaken the other. Using the defense that someone else injured Ta'mar meant that he, like the State, did not inject an issue of premeditation into the case. Nonetheless, in affirming the conviction, the majority, working back-

wards and with hindsight, reads the record and declares that there was enough evidence to support a finding of first degree murder. I cannot agree.

The majority, and to some degree the concurring opinion, relies upon the appellate review of the facts in *Hounshell v. State*, 61 Md.App. 364, 486 A.2d 789 (1985), in which the accused contended that the State's evidence failed because there was nothing introduced to show the length of time it would take to strangle a victim. We held that the jury could understand what was involved in strangulation, and so it could find the time necessary to kill by strangulation was sufficient to show premeditation. *Contra State v. Bingham*, 105 Wash.2d 820, 719 P.2d 109, 114 (Wa.1986). Speaking for this Court, however, Judge Getty observed that "the autopsy report does not reflect that death resulted from a fracture or sudden blow to the throat." *Id.* at 372, 719 P.2d 109. To hold that the time necessary to give a powerful destructive blow to an infant is equivalent to the time necessary to "kill by squeezing the throat so as to shut off the breath," *id.*, wrongly expands first degree murder beyond its separate sphere.

Even more misleading, the majority quotes *Hounshell* that "the brutality of the murder act may, in and of itself, provide sufficient evidence to convict for first degree murder." Maj. Op. at 32. But the killing in *Hounshell* required a concentrated effort by the murderer to create the brutality, so premeditation was clearly present. Read literally and independently of the facts in *Hounshell*, and applied reflexively in appeals of murder cases, the quotation may come to mean that any and all brutal killings qualify for first degree murder, with the brutality serving as a substitute for competent evidence of premeditation.

So, too, in *Fuller v. State*, 45 Md.App. 414, 413 A.2d 277 (1980), we affirmed a husband's first degree murder conviction for the stabbing death of his wife, and noted the particularly brutal nature of the crime. The multiple stab wounds in that case, however, which stretched the length and width of the victim's body, showed a "protracted and brutal assault." *Id.*

at 420, 413 A.2d 277. Protracted means an extended period of time—time enough to deliberate and support a finding of premeditation. Ta'mar's death is a tragedy; the injuries he suffered were horrific and brutal, but they do not show the kind of premeditation that the injuries in *Hounshell* and *Fuller* did.

The majority also draws a parallel between Pinkney's two blows and the defendant in *Tichnell*, who fired two shots from a gun. Tichnell's first degree conviction, however, did not rest only on the firing of the two shots, but on the circumstances surrounding his confrontation with arresting law enforcement. A shallow comparison of the two cases invites the use of acts that show an intent to kill as a substitute for proof that the defendant premeditated.

Ultimately, the majority reiterates its deference for the jury function, and the concurrence is optimistic that, notwithstanding the very real problems with the evidence, the jury successfully waded through the confusion presented to it. I emphasize that the State must prove *every* element of a crime beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *see also Thomas v. State,* 143 Md.App. 97, 121, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002). Neither the trial judge, nor this Court, can ease this burden for the State.

> [T]he reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper fact finder of his guilt with utmost certainty.

*In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Moreover, the reasonable doubt standard is "more than simply a trial ritual." *Jackson,* 443 U.S. at 316–17, 99

S.Ct. 2781. When a properly instructed jury in a state trial convicts, "even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt," the conviction violates Fourteenth Amendment due process and cannot stand. *Id.* at 317–18, 99 S.Ct. 2781.

We respected these constitutional principles in *Rasnick v. State*, 4 Md.App. 114, 241 A.2d 420 (1968), in which we reversed a first degree felony murder conviction because there was insufficient evidence of the underlying robbery. The State had put forth evidence that the victim yelled before his death, "He is robbing me." Although we recognized the trial judge's finding that the State's evidence on this point was credible, we did not find the evidence sufficient to allow a jury to conclude that the robbery occurred. There was something to support the required element of robbery, but not enough to sustain a conviction, and we were careful to mark the distinction. We applied the same reasoning and review later in *Robinson v. State*, 5 Md.App. 723, 249 A.2d 504 (1969). *See also* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515 (1991) (categorizing evidence into five "zones" of proof and analyzing the difference between a lack of evidence and the presentation of some evidence that is insufficient to meet the burden of proof).

In the context of this case, the enumerated principles of law mean that the jury could not have found Pinkney guilty of premeditated murder if there was no evidence from which it could find, beyond a reasonable doubt, that he went through a thought process and chose to act with the intent to murder the baby. The majority would allow juries to take the evidence that supports an intent to kill and use that evidence, if it so wishes, to find premeditation, even though the evidence falls short of showing, as it must, that the defendant deliberated at all. Our law does not permit such a misuse of evidence, such an obscuring of the elements of a crime.

Premeditation is by no means a simple concept. *See* J. Moylan, *supra*, at 54 (providing examples of "questionable

circumstances," in which premeditation and deliberation were found); Matthew A. Pauley, *Murder By Premeditation*, 36 Am.Crim. L.Rev. 145, 157 (1999) (discussing different approaches taken to defining and applying premeditation); Lee R. Russ, *Modern Status of the Rules Requiring Malice "Aforethought," "Deliberation," or "Premeditation," as Elements of Murder in the First Degree*, 18 A.L.R.4th 961 (same). The majority opinion evades the concept of premeditation, at best, or misconstrues it, at worst. It leads us down a path of eliminating the distinction between first and second degree murder and having juries pick the degree as a means of increasing punishment. Indeed, with this decision, we have upheld a jury's verdict of first degree murder without proof of the essential element of premeditation. We, in an overly deferential review, join the jury and the court below in a visceral resolve to punish severely the man accused of a disturbing and horrific crime.