REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2487

September Term, 2014

_____

JUSTIN T. ANDERSON

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Arthur,
Kenney, James A., III,
      (Retired, Specially Assigned),

JJ.

_____

Opinion by Kenney, J.
_____

Filed: March 30, 2016

Following a trial in the Circuit Court for Montgomery County, a jury convicted appellant, Justin T. Anderson, of attempted first-degree murder, use of a handgun in the commission of a felony and/or crime of violence, wearing, carrying, and transporting a handgun about his person, and possession of a handgun by a prohibited person.[1] The trial court sentenced appellant to a total prison term of thirty years, after which he filed a timely notice of appeal.[2]

Appellant presents the following questions for our consideration:

1. Did the trial court err by not allowing the defense to impeach a State's witness on a prior conviction for a crime that was relevant to the witness's credibility?
2. Did the trial court abuse its discretion by allowing two State's witnesses to testify after a violation of the sequestration rule?
3. Was the evidence insufficient to convict Mr. Anderson of attempted murder?

For the reasons that follow, we shall affirm the judgments of the trial court.

## FACTS AND LEGAL PROCEEDINGS

On October 30, 2012, Cariol "Jeff" Toliver was home at 1092 West Side Drive, in Gaithersburg, with his mother Theresa Toliver, his sister Celestine "Tina" Toliver, his son Pierre Toliver, and Pierre's live-in girlfriend, Edwerta Hughes.[3] That evening, Emmanuel

---

[1] The matter had been tried previously, ending in a mistrial.

[2] The court imposed a twenty-five-year sentence for the attempted murder charge, along with a consecutive five years for the handgun use charge and a concurrent one year for the handgun possession charge. The court merged the wearing, carrying, and transporting charge into the handgun use charge for sentencing purposes.

[3] Because several witnesses share a surname, and Cariol Toliver commonly goes by the name "Jeff," and Celestine Toliver commonly goes by the name "Tina," we will refer to them as such for clarity.

Gbadyu, a childhood friend of Pierre's whom the Tolivers had not seen for several months, arrived at the West Side Drive house with two other men—appellant and a man later identified as Russell Bass.

Gbadyu told Jeff he wanted to see Pierre. Something in appellant's "out there" demeanor made Jeff uncomfortable, but he permitted Gbadyu to go down to Pierre's basement bedroom.[4] Appellant, wearing what Jeff remembered as a red winter hat and black boots, remained in the hallway. While Gbadyu was in the basement, Pierre gave him a polo shirt, which may have been in lieu of $20 that Pierre owed him.

Theresa, also having "vibes" and not wanting the men in her house, told Pierre that the three men had to leave. They left through the front door and walked to a white Cadillac parked in front of the house.[5]

Jeff exited the house to make sure the men left and saw appellant pointing a small gun at Gbadyu, who was sitting in the driver's seat of the car. Shots were fired, some toward Gbadyu. He identified appellant, who had been standing by the open front passenger door of the Cadillac, as the shooter.

Afraid of being shot, Jeff ran and tried to enter his house as appellant "took off." The front door was locked, so he ran to the back of the house and entered through the basement door. Meanwhile, Theresa had dialed 911.

_____

[4] Pierre testified that appellant appeared to be on drugs.

[5] It was stipulated that the Cadillac was registered to appellant.

2

Theresa testified that she saw a man she believed to be appellant standing outside the car, holding something in his hand. Although she could not identify what he was holding, she heard two gunshots. During her call to the 911 operator, which was played for the jury, she identified the shooter as a black man wearing a red cap.

Tina, looking out an upstairs window, saw Gbadyu get into the Cadillac. When she heard a pop, she realized that he was being shot by appellant. Although she did not see a gun, she said she knew appellant shot Gbadyu because she heard a shot and then saw Gbadyu fall. Thereafter, she said, appellant walked around to the back of the house and returned a few minutes later.

Jeff and Pierre went outside, and they, along with Bass, who had been in the back seat of the car during the shooting, tried to help Gbadyu out of the car. A few minutes later, Jeff and Pierre saw appellant walking back from the same direction in which he had left. Although he said that appellant had been holding a gun when he ran away, Jeff did not see a weapon when he returned. Afraid that appellant might still have the weapon, Bass (the individual who arrived at the Toliver house with Gbadyu and appellant) and Pierre ran toward a nearby park, and Jeff ran the other way.

When Pierre heard the police sirens, he returned to his house to find appellant "holding" Gbadyu. The responding police officers described appellant, who was wearing a black jacket and red hat, as "standing over" Gbadyu when they arrived at the scene. Because appellant told the officers that Gbadyu had a gun, the officers handcuffed Gbadyu, appellant, and Pierre for safety reasons. An unidentified person appeared and informed the

3

police that appellant was the person who had shot Gbadyu; when appellant heard that statement, he began to laugh.

Gbadyu was removed to the closest trauma center with life-threatening injuries. He suffered several gunshot wounds to his lower back, abdomen, and face. A bullet fragment was recovered from his body.[6]

The police found no weapon on appellant or in the Cadillac. They did recover two .380 caliber handgun shell casings from the ground nearby and another from the interior of the Cadillac.

On November 4, 2012, a neighbor of the Tolivers, Alvaro Correa, notified the police that he had found a handgun under an overturned trashcan in his backyard. It was a Walther PPK semi-automatic, which fired .380 bullets and was later determined to be operable. The State's firearms examiner concluded that the shell casings recovered from the scene of the shooting were fired from the Walther. There were not enough individual characteristics present in the bullet fragment removed from Gbadyu's person to either identify or eliminate it as having been fired by that gun.

A gunshot residue test revealed one particle of one-component gunshot residue on one of Bass's hands, which could have come from the discharge of a firearm or from "other sources in the environment." Eight particles of three-component gunshot residue were found on appellant's right hand that, in the gunshot residue expert's opinion, could only

---

[6] Gbadyu, although subpoenaed and given immunity by the State, refused to testify during the trial. He was held in criminal contempt and sentenced to 90 days.

have come from the discharge of a firearm. The expert explained, however, that did not necessarily mean that appellant was the person who pulled the trigger; he could have obtained the residue by being in close proximity to another person firing a gun.

At the close of the State's case-in-chief, appellant moved for judgment of acquittal, arguing that the State had failed to adduce any evidence that appellant possessed the necessary specific intent to kill or cause grievous bodily harm to support a charge of attempted murder. Because the State presented no evidence of any planning by appellant or a disagreement between appellant and Gbadyu, the most it had shown was that appellant was standing by his car and fired two shots into it while the victim was inside.[7] And, in the absence of a predicate violent crime, he could not be convicted of the use of a firearm charge. Defense counsel also argued that the remaining firearm charges could not stand because no evidence sufficiently established that appellant carried or possessed a handgun. In support of that argument, he stated that no witness except Jeff saw a gun in his hand, and that Jeff had a motive to lie because his son, Pierre, may have been the shooter. The court denied the motion.

Appellant presented no evidence, and at the close of all the evidence he renewed his motion for judgment of acquittal for the reasons previously asserted. The court again denied the motion.

---

[7] After the shooting, police recovered suspected PCP and drug paraphernalia from the basement of the Toliver home. Pierre denied knowledge of that evidence, but one theory advanced by the defense was that it may have been Pierre who shot Gbadyu over a "drug deal gone bad." At trial, Tina testified that some of the drug paraphernalia belonged to her. The drug evidence was not tested by the police and was later destroyed by the State.

# DISCUSSION

## I.

Appellant first argues that the trial court erred in declining to permit him to impeach Pierre Toliver with a prior conviction for carrying a concealed weapon. He contends that, information regarding that conviction would have served to impeach Pierre's credibility because carrying a concealed weapon is a crime involving deception and shows a willingness to lie under oath.

During a bench conference, there was the following exchange:

[DEFENSE COUNSEL]: He has a prior conviction for carrying a concealed weapon.

[PROSECUTOR]: I don't think he actually has that conviction.

[DEFENSE COUNSEL]: He has the conviction.

[PROSECUTOR]: He had the conviction but it's not impeachable.

THE COURT: Well, he does not have the conviction?

[PROSECUTOR]: He does have the conviction.

THE COURT: He does have the conviction but---

[PROSECUTOR]: It's not impeachable, Your Honor.

THE COURT: Okay.

[DEFENSE COUNSEL]: And we maintain that it is, Your Honor, the test for when a conviction is impeachable is whether it shows hiding or deception, or attempting to hide or deceive. By definition, if someone is concealing a weapon, they have the propensity to deceive and to hide things.

THE COURT: Okay. As far as the time, 15 years, it's within 15 years?

[PROSECUTOR]: It is, Your Honor, but it's not one of the enumerated—

6

THE COURT: No I understand it's not. I know your objection.

[PROSECUTOR]: Oh yeah, I'm sorry. I think it was---

[DEFENSE COUNSEL]: It was in 2006.

THE COURT: 2006, okay. Yes, it is not. It is not and I am going to rule that it not [sic] an impeachable offense.

Maryland Rule 5–609 provides, in pertinent part:

(a) **Generally.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or objecting party.

(b) **Time limit.** Evidence of a conviction is not admissible under this Rule if a period of more than 15 years has elapsed since the date of the conviction.

We employ a three-part test under Rule 5–609 to determine whether a witness may be impeached with evidence of a prior conviction. *See King v. State*, 407 Md. 682 (2009). First, the court determines whether the conviction sought to be used to impeach a witness's credibility falls within the "eligible universe" of crimes, which consists of two categories, "infamous crimes" and "other crimes relevant to the witness's credibility." *Id.* at 698-99. "Infamous crimes include treason, common law felonies, and other crimes classified as *crimen falsi*."[8] *Id.* at 699. To fall into the category of "other crimes relevant to the witness's credibility,"

---

[8] "*Crimen falsi* offenses 'include crimes in the nature of perjury, false statements, criminal fraud, embezzlement, false pretense, or any other offense involving some element of deceitfulness, untruthfulness, or falsification bearing on the witness's propensity to

7

> the crime itself, by its elements, must clearly identify the prior conduct of the witness that tends to show that he is unworthy of belief. Moreover, a crime tends to show that the offender is unworthy of belief, if the perpetrator "lives a life of secrecy" and engages in "dissembling in the course of [the crime], being prepared to say whatever is required by the demands of the moment, whether the truth or a lie."

*Washington v. State*, 191 Md. App. 48, 82 (2010) (alteration in original) (quoting *State v. Westpoint,* 404 Md. 455, 484 (2008)).

If the prior crime is not within either of the two categories, "it is inadmissible, and the analysis ends." *Westpoint,* 404 Md. at 477 (quoting *State v. Giddens*, 335 Md. 205, 213 (1994)). If the crime does fall within one of the two categories, the burden is on the proponent (in this case, appellant) "to establish that the conviction was not more than 15 years old, that it was not reversed on appeal, and that it was not the subject of a pardon or a pending appeal." *Westpoint*, 404 Md. at 477-78. If that burden is satisfied, the trial court, before admitting the prior conviction for impeachment purposes, must determine that the probative value of the prior conviction outweighs the danger of unfair prejudice to the witness or objecting party. *Id*. at 478. That balancing is a matter of trial court discretion. *Id*. By requiring the trial court to weigh probative value against the danger of unfair prejudice, "Rule 5–609 attempts 'to discriminate between the informative use of past convictions to test credibility, and the pretextual use of past convictions where the convictions are not probative of credibility but instead merely create a negative impression'

---

testify truthfully.'" *Fulp v. State*, 130 Md. App. 157, 164 (2000) (quoting *State v. Giddens,* 335 Md. 205, 213 n.5 (1994)).

of the witness." *Id.* (quoting *Jackson v. State*, 340 Md. 705, 716, (1995)); *see also King*, 407 Md. at 700.

Appellant and the State agree that Maryland's appellate courts have not specifically determined whether carrying a concealed weapon is an offense that may be admissible for impeachment purposes pursuant to Rule 5-609. In our view, the trial court correctly determined that it is not.

Maryland law prohibits a person from "wear[ing] or carry[ing] a dangerous weapon of any kind concealed on or about the person." Md. Code (2002, 2012 Repl. Vol., 2015 Supp.), § 4-101(c) of the Criminal Law Article. To be sure, the crime requires concealment of the weapon, but there is nothing inherent in the elements of the offense that bears directly on the likelihood that the offender would lie under oath.

In *Westpoint*, the Court of Appeals explained that a person who has committed a third-degree sexual offense usually acts in secrecy, but acting in secrecy, "in and of itself, is not sufficient to render the prior conviction admissible for the purpose of impeachment." 404 Md. at 486. Similarly, the *Westpoint* Court added that convictions for simple possession of controlled dangerous substances, which "by their nature" involve secrecy, are not admissible as impeachment evidence. *Id*. In *Correll v. State*, 215 Md. App. 483, 506-07 (2013), this Court determined that failure to register as a sex offender did "not include an intent to deceive," and therefore, was not a crime admissible for impeachment because an offender "can knowingly fail to register, thus committing the crime, for reasons that are not deceptive."

9

We are not persuaded that the elements of the crime of carrying a concealed weapon clearly identify conduct indicating that Pierre was unworthy of belief. That is, by carrying a concealed weapon he lives a life of secrecy, engages in dissembling, and is prepared to lie if required by the demands of the moment. *Westpoint,* 404 Md. at 484. Because the crime of carrying a concealed weapon is neither an infamous crime nor a crime relevant to his credibility, we hold that the trial court correctly precluded appellant from using Pierre's conviction for that offense to impeach him.

Moreover, had we concluded that the court erred in declining to permit the defense to impeach Pierre with the prior conviction, we would hold any such error to be harmless. *See id.* at 487 (concluding that a conviction can stand if upon independent review of the record, we are able to conclude, beyond a reasonable doubt, that the error in no way influenced the verdict). At trial, the State's witnesses all presented virtually the same testimony, that is, that Gbadyu and appellant came to the Tolivers' house and spoke with Pierre for a short period of time before leaving. After Gbadyu and appellant left the house, Jeff, Theresa, and Tina witnessed the shooting, and all three identified appellant as the shooter, but only Jeff testified that he saw appellant with a gun. Pierre, however, did not witness the shooting, and, therefore, could not testify to it. Even if Pierre was impeached for carrying a concealed weapon, he was not a material witness to the charged crimes.

**II.**

Appellant next contends that the trial court abused its discretion in failing to impose a sanction for a violation of the court's sequestration rule committed by Pierre Toliver, who was observed speaking to Tina Toliver and Edwerta Hughes about the case prior to their

10

testimony. Appellant asserts that Pierre's violation of the rule "could well have influenced the testimony of the later witnesses," and therefore, the court should have excluded Tina's and Ms. Hughes's testimony.

Following Theresa's testimony, the prosecutor asked to approach the bench, advising the court she had been handed a note by another Assistant State's Attorney ("ASA"), who had been involved in the first trial and was familiar with the witnesses. In the note, that ASA, Morgan Zander, indicated that, as she was walking toward the courtroom, she heard Pierre talking to Tina and Ms. Hughes.

In response to the court's inquiry of Ms. Zander about what she had heard, she testified that she had seen Pierre speaking to both women about

> giving somebody $20 and then something to the effect that he gave him a shirt and that he didn't give the other person a shirt because he didn't want one, or something to that effect. And then I heard him say wrong, as I heard him testify earlier this morning in response to defense counsel's questions, wrong. And so based on my knowledge of the case of seeing Mr. Toliver testify earlier, I surmised it was related to this case.

She did not hear Tina or Ms. Hughes say anything to Pierre in response, nor did she observe any non-verbal responses from either of them that indicated a two-sided conversation. She added that the prosecutor had asked her to tell the witnesses to stop speaking about the case, and when she returned to do so, their conversation had moved on to another topic unrelated to the case.

Defense counsel asked for some time to contemplate what, if any action, to request of the court. The State stated it still intended to call Tina and Ms. Hughes to testify, as it

11

did not appear that they had reciprocated in any conversation with Pierre, and the matter that he had verbalized regarded a "collateral matter."

The court questioned Tina and Ms. Hughes. When asked if Pierre had had a conversation with her or anyone else about the testimony in the case, Tina said, "[n]ot exactly his testimony. He said it was a lot more than last time." In response, she said only, "oh God, we're going to be in here long." She denied any further discussion about anything related to the trial. Ms. Hughes denied any conversation with Pierre regarding his testimony or the shirt or $20. The court advised both women not to discuss any aspect of the case with other witnesses.

The court stated that "there was a violation of the order by the excused witness, Pierre Toliver, in his communications to or in the presence of Tina Toliver and Edwerta Hughes." Defense counsel argued that the sequestration rule had been violated not only by Pierre, but also by Tina and Ms. Hughes, because all three witnesses had been admonished not to speak with each other. Counsel sought exclusion of Tina's and Ms. Hughes's testimony, as well as an instruction to the jury that Pierre had violated the rule and it could take that into account in assessing his credibility. The State argued that Ms. Zander had not overheard a conversation, but rather a one-sided complaint by Pierre that defense counsel had the facts wrong and that the trial was "much harder than last time." And, given the State's knowledge of Tina's and Ms. Hughes's testimony from the first trial, it was unlikely that any statement by Pierre would affect their testimony at the trial in progress.

The court reiterated its ruling that the sequestration rule had been violated only by Pierre, who had already testified and been excused, and that Pierre appeared to have done nothing more than vent about the trial being harder than last time, which was not likely intended to coach or sway the testimony of the two women. The court found no indication that the severe sanction sought by the defense was justified, given the case law that exclusion of a witness's testimony for a violation of the sequestration rule should not be lightly imposed and the fact that the parties had the benefit of the witnesses' testimony in the first trial. Because the violation, in the court's view, was not substantiated, the court found it unnecessary to alert the jury to the violation.

The exclusion of witnesses is governed by Rule 5-615, which states, in pertinent part:

> **(a) In General.** Except as provided in sections (b) and (c) of this Rule, upon the request of a party made before testimony begins, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses. When necessary for proper protection of the defendant in a criminal action, an identification witness may be excluded before the defendant appears in open court. The court may order the exclusion of a witness on its own initiative or upon the request of a party at any time. The court may continue the exclusion of a witness following the testimony of that witness if a party represents that the witness is likely to be recalled to give further testimony.
>
> \* \* \*
>
> **(d) Nondisclosure.** (1) A party or an attorney may not disclose to a witness excluded under this Rule the nature, substance, or purpose of testimony, exhibits, or other evidence introduced during the witness's absence.
> (2) The court may, and upon request of a party shall, order the witness and any other persons present in the courtroom not to disclose to a witness excluded under this Rule the nature, substance, or purpose of testimony, exhibits, or other evidence introduced during the witness's absence.

**(e) Exclusion of Testimony.** The court may exclude all or part of the testimony of the witness who receives information in violation of this Rule.

The object of the rule "'is to prevent one prospective witness from being taught by hearing another's testimony; its application avoids an artificial harmony of all the testimony; it may also avoid the outright manufacture of testimony.'" *Tharp v. State*, 362 Md. 77, 95 (2000) (quoting *Redditt v. State,* 337 Md. 621, 629 (1995)).

When a witness violates a sequestration order, "whether there is to be a sanction and, if so, what sanction to impose, are decisions left to the sound discretion of the trial judge." *Redditt,* 337 Md. at 629. "We will not reverse a trial court's decision regarding whether sanctions should be imposed absent an abuse of discretion." *Lupfer v. State*, 194 Md. App. 216, 251 (2010), *rev'd on other grounds*, 420 Md. 111 (2011).

The sanction requested by appellant, the exclusion of witness testimony, is considered a harsh one. *Id.*; *see also Redditt,* 337 Md. at 629 (quoting *Frazier v. Waterman Steamship Corp.,* 206 Md. 434, 446 (1955) ("[Because] 'the ascertainment of the truth is the great end and object of all the proceedings in a judicial trial,' . . . the complete exclusion of the testimony of witnesses for a violation of the sequestration rule is not lightly to be imposed as a penalty upon even an offending party.")). Critical to the court's exercise of its discretion of what, if any, sanction should be imposed, is the consideration of "the degree of schooling in the details of the evidence obtained by the potential witness as a result of the sequestration order violation." *Redditt,* 337 Md. at 632.

Here, there was no evidence that Pierre's lamentation about the difficulty of the second trial or his concern regarding a shirt given to Gbadyu would have influenced either

Tina's or Ms. Hughes's testimony about the events surrounding Gbadyu's shooting. We perceive no abuse of discretion in the court's denial of appellant's request to exclude their testimony.

**III.**

Finally, appellant claims that the evidence adduced by the State was insufficient to sustain a conviction of attempted first-degree murder because the State failed to prove that he had a willful, deliberate, and premeditated intent to kill Gbadyu.[9] In his view, merely shooting into the car where Gbadyu was sitting, in the absence of evidence of an argument or disagreement between the men, was not enough to establish the requisite intent to kill.

We recently set forth the applicable standard for reviewing challenges to the sufficiency of the evidence:

> In reviewing the sufficiency of the evidence, an appellate court determines "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Derr v. State,* 434 Md. 88, 129, 73 A.3d 254 (2013); *Painter v. State,* 157 Md. App. 1, 11, 848 A.2d 692 (2004) ("[t]he test is 'not whether the evidence *should have or probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder'") (citations omitted) (emphasis in original).
> The appellate court thus must defer to the factfinder's "opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence[.]" *Pinkney v. State,* 151 Md. App. 311, 329, 827 A.2d 124 (2003); *see also State v. Mayers,* 417 Md. 449, 466, 10 A.3d 782 (2010) ("[w]e defer to any possible reasonable inference the jury could have drawn from the admitted evidence and need not decide whether the jury could have drawn other inferences from the evidence, refused to draw inferences, or

---

[9] Appellant does not appear to dispute that he shot Gbadyu, and he makes no specific claim of insufficiency of the evidence relating to the remainder of the crimes of which he was convicted.

15

whether we would have drawn different inferences from the evidence") (citations omitted). Circumstantial evidence, moreover, is entirely sufficient to support a conviction, provided that the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused. *See, e.g., State v. Manion,* 442 Md. 419, 431–32, 112 A.3d 506 (2015); *Painter,* 157 Md. App. at 11, 848 A.2d 692.

*Benton v. State*, 224 Md. App. 612, 629-30 (2015).

First-degree murder requires "a deliberate, premeditated, and willful killing." *Morris v. State*, 192 Md. App. 1, 31 (2010). As defined by Maryland Pattern Jury Instruction—Criminal 4:17,

[w]illful means that the defendant actually intended to kill [the victim]. Deliberate means that the defendant was conscious of the intent to kill. Premeditated means that the defendant thought about the killing and that there was enough time before the killing, though it may have only been brief, for the defendant to consider the decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.

*See also Pinkney v. State*, 151 Md. App. 311, 331-32 (2003). To prove, as in this case, attempted first-degree murder, the State must adduce evidence "'that the defendant possess[ed] the intent to kill [in this case, Gbadyu] (willful), that the defendant ha[d] conscious knowledge of that intent (deliberate), and that there [was] time enough for the defendant to deliberate, *i.e.,* time enough to have thought about that intent (premeditate).'" *Morris*, 192 Md. App. at 31 (alterations in original) (quoting *Willey v. State*, 328 Md. 126, 133 (1992)).

Because few defendants announce to witnesses their intent to kill, we most often have to look to other factors to discern whether the defendant had a specific intent to kill. *Pinkney*, 151 Md. App. at 332. Our courts have held that a jury is justified in finding that

16

a defendant had a specific purpose to kill when he shot the victim several times at point blank range.[10] *Id.* at 333 (citing *Cummings v. State*, 223 Md. 606 (1960)). And, when a defendant's actions so clearly involve actions that are likely to bring about death, they speak for themselves with regard to willfulness. *Pinkney*, 151 Md. App. at 333. Here, there was evidence that appellant fired a deadly weapon several times directly at Gbadyu from a distance of only several feet. One shot hit Gbadyu in the face. The jury rationally could have concluded that this demonstrated a specific purpose and intent to kill Gbadyu. *See id.*

The evidence also provides support for the conclusion that the evidence supported a finding of deliberation and premeditation. The test for first-degree murder is whether there was deliberation and premeditation—sufficient time to reflect—although the deliberation or premeditation need not exist for any particular length of time and can be very brief. *Tichnell v. State,* 287 Md. 695, 717-18 (1980). Although he claims that "the firing of multiple shots alone is not sufficient proof of premeditation," it is well established in Maryland that "the firing of two or more shots separated by an interval of time may be viewed as evidence of premeditation." *Id.* at 701, 719 (affirming the jury's first-degree murder conviction when a witness heard "a burst of shots, followed by a split second pause, the sound of tires spinning and a simultaneous second burst of shots"); *see Pinkney*, 151

_____

[10] The lead paramedic responding to the scene testified at trial that Gbadyu had seven gunshot wounds: one on each side of his jaw, three in the lower back and left side of the abdomen, and two on the right shoulder.

Md. App. at 338 and cases cited therein; *Chisum v. State*, No. 0077, Sept. Term, 2015 (filed Feb. 25, 2016); __ Md. App. __ (2016).

In sum, the evidence, which included multiple shots fired at and striking Gbadyu from close range (with at least one at a vital part of the anatomy), was legally sufficient to support a conviction for attempted first-degree murder. It was the jury's function to decide which inferences to draw from proven facts, and the jury in this case could have found that appellant took a substantial step, beyond mere preparation, had the ability to murder Gbadyu, and willfully, and with premeditation and deliberation intended to do so.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT**.